**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1216**

MARY E. EDMONSON,

       Plaintiff - Appellant,

    v.

EAGLE NATIONAL BANK; EAGLE NATIONWIDE MORTGAGE COMPANY; EAGLE NATIONAL BANCORP, INCORPORATED; ESSA BANCORP, INCORPORATED; ESSA BANK & TRUST,

       Defendants - Appellees.

**No. 18-1229**

RENITA JAMES,

       Plaintiff - Appellant,

    v.

ACRE MORTGAGE & FINANCIAL, INC.,

       Defendant - Appellee.

**No. 18-1230**

D'ALAN E. BAUGH; PENNY FRAZIER,

Plaintiffs - Appellants,

v.

THE FEDERAL SAVINGS BANK,

Defendant - Appellee.

---

**No. 18-1260**

---

TRACIE PARKER DOBBINS; GLADYS PARKER,

Plaintiffs - Appellants,

v.

BANK OF AMERICA, N.A.,

Defendant - Appellee.

---

**No. 18-1262**

---

JILL BEZEK; MICHELLE HARRIS

Plaintiffs - Appellants,

v.

FIRST MARINER BANK

Defendant - Appellee.

---

Appeals from the United States District Court for the District of Maryland at Baltimore. Richard D. Bennett, District Judge. (1:16-cv-03938-RDB; 1:17-cv-00540-RDB; 1:17-cv-01734-RDB; 1:17-cv-01735-RDB; 1:17-cv-02902-RDB)

---

Argued: December 11, 2018                                    Decided: April 26, 2019

---

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Harris joined.

---

**ARGUED:** William James Murphy, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, for Appellants. Ryan Thomas Becker, FOX ROTHSCHILD LLP, Philadelphia, Pennsylvania, for Appellees. Brian David Schmalzbach, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee Bank of America National Association. **ON BRIEF:** Cyril V. Smith, Adam B. Abelson, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland; Michael Paul Smith, SMITH, GILDEA & SCHMIDT, LLC, Towson, Maryland; Timothy F. Maloney, JOSEPH, GREENWALD & LAAKE, P.A., Greenbelt, Maryland, for Appellants. George J. Krueger, FOX ROTHSCHILD LLP, Philadelphia, Pennsylvania; Brian Moffet, MILES & STOCKBRIDGE P.C., Baltimore, Maryland, for Appellees Eagle Nation Bank, Eagle Nationwide Mortgage Company, Eagle National Bancorp, Incorporated, Essa Bancorp, Incorporated, and Essa Bank & Trust. Bradley R. Kutrow, MCGUIRE WOODS LLP, Charlotte, North Carolina, for Appellee Bank of America National Association. Ari Karen, OFFIT KURMAN, PA, Baltimore, Maryland, for Appellees Acre Mortgage & Financial, Inc, and The Federal Savings Bank. Michael E. Blumenfeld, NELSON MULLINS RILEY & SCARBOROUGH LLP, Baltimore, Maryland, for Appellee First Mariner Bank.

---

WYNN, Circuit Judge:

Each of the five Plaintiffs in this matter brought a putative class action alleging that between 2009 and 2014 certain lenders participated in "kickback schemes" prohibited by the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*. But the district court dismissed their claims because the first of the five class actions at issue in this appeal was not filed until June 23, 2016, well after the expiration of RESPA's one-year statute of limitations. We, however, hold that, under the allegations set forth in their complaints, Plaintiffs are entitled to relief from the limitations period under the fraudulent concealment tolling doctrine. Accordingly, we reverse the district court's dismissal of Plaintiffs' actions.

I.

Because the district court dismissed Plaintiffs' actions under Federal Rule of Civil Procedure 12(b)(6), we take the non-conclusory factual allegations in Plaintiffs' complaints as true and draw all reasonable inferences therefrom in Plaintiffs' favor. *In re GNC Corp.*, 789 F.3d 505, 512 (4th Cir. 2015).

Between 2009 and 2014, Defendants—several banks and mortgage companies (each, a "Lender," and collectively, the "Lenders")[1]—originated or serviced residential mortgages obtained by Plaintiffs. Mortgage brokers and loan officers employed by the Lenders referred Plaintiffs to Genuine Title, LLC ("Genuine Title") to procure title

---

[1] The Lenders are Eagle National Bank and several of its predecessors and affiliates; Bank of America, N.A.; Acre Mortgage & Financial, Inc.; The Federal Savings Bank; and First Mariner Bank.

insurance and obtain escrow and settlement services.  Plaintiffs allege that Genuine Title provided the Lenders with several forms of "unearned fees and kickbacks" to induce those referrals, J.A. 8, in violation of RESPA, which forbids, among other things, any person from "giv[ing or] accept[ing] any fee, kickback, or thing of value pursuant to any agreement or understanding . . . [as] part of a real estate settlement service involving a federally related mortgage loan," 12 U.S.C. § 2607(a).

In the scheme's most basic form, Genuine Title transferred more than $4,000,000 to an entity named Brandon Glickstein, Inc. ("BGI"), which purportedly provided "advertising and marketing" services.  J.A. 13–14.  Brandon Glickstein, who founded BGI, had previously served as "Genuine Title's lead marketing and account representative."  J.A. 13.  Using the funds it received from Genuine Title, BGI made millions of dollars in direct cash payments to the Lenders' brokers and loan officers who made referrals to Genuine Title.  Brokers and loan officers who referred more customers to Genuine Title received larger payments from BGI.

Plaintiffs further allege that Glickstein founded a second company, Competitive Advantage Media Group, LLC ("Competitive Advantage"), that made in-kind payments to the Lenders' brokers and loan officers.  In particular, Competitive Advantage provided "free or discounted leads, postage, and/or marketing materials and services and/or credits for mortgage brokers and lenders" associated with the Lenders.  J.A. 14.  Genuine Title allegedly paid for some or all of the promotional materials Competitive Advantage provided to the Lenders' brokers and loan officers.

5

According to the complaint, the amount that Genuine Title paid Competitive Advantage for the promotional materials Competitive Advantage provided to the Lenders' brokers or loan officers varied with the number of referrals the broker or loan officer made to Genuine Title. "For example, if a [r]eferring [b]roker who used [Competitive Advantage] for his or her marketing materials referred five (5) mortgages that closed with Genuine Title in one month, and the agreement with Genuine Title was that each closing was valued at $200, Genuine Title would pay [Competitive Advantage] $1,000 the next month to be applied to the [r]eferring [b]roker's marketing materials produced by [Competitive Advantage]." J.A. 15.

Furthermore, Plaintiffs allege that Genuine Title entered into agreements pursuant to which a broker or loan officer associated with a Lender that refused to lend to a prospective borrower because the borrower failed to meet the Lender's underwriting standards would refer the borrower to another Lender that frequently worked with Genuine Title. That second Lender's broker or loan officer would refer the borrower to Genuine Title for title services. Under these agreements, Genuine Title would provide a cash or in-kind kickback to (1) the broker or loan officer of the Lender that referred the borrower to the second Lender and (2) the second Lender's broker or loan officer, who ultimately originated or serviced the borrower's mortgage and who referred the borrower to Genuine Title. Again, the payments to the brokers or loan officers employed by the two Lenders varied with the volume of referrals. Neither Genuine Title nor the Lenders disclosed the alleged kickbacks to Plaintiffs.

6

Although the complaint alleges violations between 2009 and 2014, the first of the five class actions at issue in this appeal was not filed until June 23, 2016, well after the expiration of RESPA's one-year statute of limitations. Plaintiffs' complaints assert that Plaintiffs are entitled to relief from the limitations period, however, because the Lenders fraudulently concealed the alleged kickback scheme.

To that end, Plaintiffs allege that BGI and Competitive Advantage were "sham" entities and that "the use of [BGI and Competitive Advantage] was intended to conceal, and did conceal, the Kickback Scheme from borrowers, including Plaintiff, Class Members, and regulators." J.A. 13. In support of the allegation that BGI and Competitive Advantage were "sham[s]," the complaints allege, for example, that "[t]he Resident Agent for [Competitive Advantage] at the time of organization was Jonathan S. Bach, Esq., the in-house attorney for Genuine Title" and that, at that time, "the address for [Competitive Advantage] was the same physical address [as] Genuine Title." J.A. 14.

The complaints further allege that some of the brokers or loan officers employed by the Lenders "created shell companies to receive the [cash] payments" from BGI, whereas other brokers and loan officers used previously existing entities for the sole purpose of receiving the payments. J.A. 16. According to the complaints, the "[p]ayments were made and received in this way to conceal, and did conceal, the Kickback Scheme from borrowers, including Plaintiff and other Class Members, and regulators." *Id.* Once investigators began examining the payments from BGI to the Lenders' brokers and loan officers, "Genuine Title drafted sham Title Services Agreements for [r]eferring [b]rokers with the intent to disguise and conceal [cash]

7

payments as legitimate fees for alleged title services provided by [r]eferring [b]rokers, and Genuine Title back-dated said agreements." J.A. 16–17. In support of the allegation that the Title Service Agreements were "sham[s]," the complaints allege that the cash payments from BGI to the Lenders' referring brokers and loan officers "were not made in accordance with the fee schedule in the Title Services Agreements and the [r]eferring [b]rokers performed no services for Genuine Title." J.A. 17.

The complaints further alleged that the Lenders concealed the kickbacks by not reporting the payments from BGI on HUD-1 Settlement Statements[2] and other settlement documents the Lenders provided to Plaintiffs, notwithstanding that federal regulations require that HUD-1 Settlement Statements "include any amounts received for origination services, including administrative and processing services, performed by or on behalf of the loan originator," 12 C.F.R. § 1024, App. A, and provide a good faith estimate of "all charges that all loan originators involved in [the] transaction will receive," *id.* § 1024, App. C.

Potentially complicating Plaintiffs' request for relief from RESPA's limitation period based on fraudulent concealment, however, is that Genuine Title, its officers, and brokers and loan officers employed by lenders not named as defendants in this case

---

[2] A HUD-1 Settlement Statement is a standard form provided to borrowers listing the "actual charges and adjustments paid by the borrower and seller," and "given to the parties in connection with the settlement." 12 C.F.R. § 124, App. A. For most mortgage transactions occurring after October 3, 2015, borrowers now receive what is called a "Closing Disclosure" instead. *What Is a HUD-1 Settlement Statement?*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/ask-cfpb/what-is-a-hud-1-settlement statement-en-178/ (last visited on March 27, 2019).

8

previously have faced legal actions premised on similar conduct. In 2013, for example, Edward and Vickie Fangman filed a complaint alleging that Genuine Title provided kickbacks to mortgage brokers and loan officers affiliated with several mortgage lenders and brokers in exchange for referrals. *See Fangman v. Genuine Title*, No. RDB-14-0081 (D. Md. 2014). Counsel for the *Fangman* plaintiffs—the law firms Smith, Gildea & Schmidt, LLC, and Joseph, Greenwald & Lake, P.A.—represented some of the Plaintiffs in the present action.

Genuine Title filed for bankruptcy in 2014. Thereafter, Genuine Title's bankruptcy receiver provided counsel for the *Fangman* plaintiffs with access to Genuine Title's documents, records, and computer servers. From these records, *Fangman* counsel identified and located prospective class members as well as several additional lenders that allegedly received kickbacks from Genuine Title. Counsel then contacted these members and filed two Amended Complaints, naming several lenders as additional defendants, including, for a short time, two of the defendants in the instant case: Eagle National Bank and Bank of America, N.A.

Like Plaintiffs, the *Fangman* plaintiffs sought relief from RESPA's one-year limitations period under the doctrine of fraudulent concealment. The district court in *Fangman* held the plaintiffs' allegations of fraudulent concealment—which track those asserted by Plaintiffs in the instant case—were sufficient to satisfy Federal Rules of Civil Procedure 9(b) and 12(b)(6). *See J. v. Genuine Title, LLC*, No. RDB-14-0081, 2015 WL 8315704, at *7 (D. Md. Dec. 9, 2015).

9

In reaching that conclusion, the court first held that the *Fangman* defendants engaged in affirmative acts of concealment, including by concealing the business relationship between Genuine Title and the defendant lenders, failing to disclose the referral payments on the borrowers' HUD-1 Settlement Statements, and entering into sham Title Services Agreements. The court further held the *Fangman* Plaintiffs adequately alleged that they did not and "could not have reasonably known of their cause of action until contacted by [their] attorneys." *Id.* "Rather than sleeping on their rights, [the *Fangman*] Plaintiffs' counsel has undergone a large-scale review of Defendant Genuine Title's computer system. It is only through this review, aided by early discovery and a proprietary software system, that potential plaintiffs have been identified," the court held.[3] *Id.* The district court subsequently ruled that the evidence the *Fangman* plaintiffs adduced in discovery was sufficient to satisfy their burden to prove their entitlement to tolling based on fraudulent concealment. *See Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 WL 6600509, at *4–7 (D. Md. Nov. 8, 2016).

Meanwhile, on January 22, 2015, the Consumer Financial Protection Bureau and the Maryland Attorney General initiated enforcement proceedings against Wells Fargo Bank, N.A. ("Wells Fargo") and JPMorgan Chase Bank, N.A. ("J.P. Morgan"), alleging those two financial institutions engaged in a similar kickback scheme with Genuine Title. Wells Fargo and J.P. Morgan entered into a settlement agreement with the enforcement

---

[3] The *Fangman* plaintiffs voluntarily withdrew their claims against Bank of America before the district court considered the motion to dismiss. *See id.* at *1 n.6.

10

agencies, agreeing to pay approximately $35 million dollars. That agreement received press coverage in, among other media outlets, *The Wall Street Journal*, *The Baltimore Sun*, and *The Washington Post*.

Additionally, on April 29, 2015, the Consumer Financial Protection Bureau and the Maryland Attorney General brought a separate enforcement action against Genuine Title, alleging that Genuine Title, its principal, and affiliates engaged in cash payments and other kickbacks in exchange for referrals. Although the case settled, and the settlement orders contemplated additional private litigation by consumers, neither the Consumer Financial Protection Bureau nor the Maryland Attorney General required any of the financial institutions named in the enforcement actions to issue any formal notices to the public.

During the pendency of the *Fangman* litigation and the federal and state enforcement proceedings, Plaintiffs' counsel further analyzed the materials provided by Genuine Title's bankruptcy receiver and identified additional borrowers potentially impacted by Genuine Title's alleged kickbacks to lenders and brokers. Based on that analysis, Plaintiffs filed the five putative class actions at issue in this appeal. Each putative class action names as defendant a separate financial institution or corporate family of financial institutions, which employed brokers and loan officers that allegedly received kickbacks from Genuine Title.

Like the defendants in *Fangman*, the Lenders moved to dismiss on grounds that Plaintiffs failed to file their actions within RESPA's one-year limitations period and were not entitled to rely on the doctrine of fraudulent concealment to obtain relief from the

11

limitations period. Unlike in *Fangman*, however, the district court refused to toll the limitations period based on fraudulent concealment and, therefore, dismissed Plaintiffs' actions. *See Edmondson v. Eagle Nat'l Bank*, No. RDB-16-3938, 2018 WL 582514, at *8-9 (D. Md. Jan. 29, 2018).

In *Fangman*, the district court focused on whether the defendants engaged in affirmative acts of concealment and whether the plaintiffs failed to discover the facts within the statutory period despite the exercise of due diligence, *Fangman*, 2015 8315704, at *7—the traditional factors this Court has recognized bear on fraudulent concealment. *See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995). However, this time, the district court's opinion dismissed Plaintiffs' action on grounds that they failed to sufficiently allege "extraordinary circumstances" prevented the timely filing of their claims. *Edmondson*, 2018 WL 582514, at *6–9 (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755 (2016)).

In dismissing Plaintiffs actions, the district court held no extraordinary circumstances were present because (1) Plaintiffs' *counsel* had access to the data used to identify the Lenders' alleged wrongdoing "by June 2015" and (2) the named Plaintiffs should have discovered the existence of their claims "in May 2015 at the latest" based on information publicly disclosed in the *Fangman* complaint and the media coverage of Genuine Title's wrongdoing. *Id.* at *7–8. The district court further concluded that no "extraordinary circumstances" existed—that this case did not "present one of those rare instances where . . . it would be unconscionable to enforce the limitation period . . . and

12

gross injustice would result"—because Plaintiffs' counsel "has already secured significant awards for their efforts to hold Genuine Title and other financial institutions accountable for violating RESPA." *Id.* at \*8 (internal quotation marks and alterations omitted).

Plaintiffs timely appealed.

## II.

We review de novo a district court's decision to grant a motion to dismiss pursuant to Rule 12(b)(6), including claims for fraudulent concealment. *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 233 (4th Cir. 2000); *Wood v. Com.*, 155 F.3d 564 (4th Cir. 1998) (unpublished) (reviewing de novo whether the complaint sufficiently alleged fraudulent concealment).

The sole issue on appeal is whether the district court properly dismissed the five complaints on grounds that Plaintiffs failed to sufficiently allege their entitlement to relief from RESPA's one-year limitations period based on fraudulent concealment. To decide this issue, we will consider (A) whether RESPA's one-year statute of limitations for claims under Section 2607, 12 U.S.C. § 2614, is subject to tolling based on fraudulent concealment; (B) if so, whether the district court applied the proper test in holding that Plaintiffs failed to adequately allege their entitlement to tolling based on fraudulent concealment; and (C) whether Plaintiffs' allegations bearing on fraudulent concealment are sufficient to survive a motion to dismiss under Rule 12(b)(6).

13

A.

We first look at whether RESPA's one-year statute of limitations for claims under Section 2607, 12 U.S.C. § 2614, is subject to tolling based on fraudulent concealment. The Supreme Court has held that "time bars in suits between *private* parties are presumptively subject to" tolling on equitable grounds. *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1630 (2015) (emphasis in original). To that end, the Supreme Court has held that "the fraudulent concealment tolling doctrine is to be 'read into every federal statute of limitation.'" *Marlinton*, 71 F.3d at 122 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). We believe *Holmberg* ends the inquiry and makes RESPA's one-year statute of limitations, like "every federal statute of limitation," 327 U.S. at 397, subject to tolling based on fraudulent concealment.[4] Even so, we follow our sister circuits and consider whether the time limitations in Section 2614 operate as a jurisdictional bar rendering tolling on equitable grounds categorically unavailable. We conclude it does not.

---

[4] In an unpublished per curiam opinion, a panel of this Court concluded that RESPA's one-year statute of limitations was jurisdictional, and therefore not subject to tolling based on fraudulent concealment. *See Zaremski v. Keystone Title Assocs., Inc.*, 884 F.2d 1391 (4th Cir. 1989) (unpublished). Unpublished decisions, of course, do not constitute binding precedent in this Circuit. *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996). And we are not persuaded to follow *Zaremski*, which was "sparely reasoned," *Minter v. Wells Fargo Bank, N.A.*, 675 F. Supp. 2d 591, 594 (D. Md. 2009), and which predates the Supreme Court's recent jurisprudence "press[ing] a stricter distinction between truly jurisdictional rules . . . and nonjurisdictional 'claim-processing rules'" and admonishing lower courts to "not lightly attach those 'drastic' consequences" of treating a timely filing provision as jurisdictional, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

When Congress makes a limitations period a jurisdictional prerequisite, then courts may not toll the limitations period on any equitable grounds. *See Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000); *see also, e.g.*, *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 500 (3d Cir. 1998) ("A limitation period is not subject to equitable tolling if it is jurisdictional in nature."). For guidance, "the Supreme Court has established a clear statement rule for determining whether procedural rules, including time bars, are jurisdictional." *Stewart v. Iancu*, 912 F.3d 693, 700 (4th Cir. 2019); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (holding that "absent such a clear statement . . . courts should treat [a statutory timeliness requirement] as nonjurisdictional in character" (internal quotation marks omitted)). "*Only* if the statutory text 'plainly show[s] that Congress imbued a procedural bar with jurisdictional consequences' should a court treat a rule as jurisdictional." *Stewart*, 912 F.3d at 700 (quoting *Kwai Fun Wong*, 135 S. Ct. at 1632 (emphasis added)). Put otherwise, Congress must "do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it." *Kwai Fun Wong*, 135 S. Ct. at 1632.

RESPA's limitation provision states, in pertinent part:

Any action pursuant to the provisions of [this title] may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within . . . 1 year in the case of a violation of section 2607 . . . from the date of the occurrence of the violation[.]

12 U.S.C. § 2614. Thus, the plain language of Section 2614 does not state—clearly or otherwise—that the one-year limitations period is a jurisdictional prerequisite. And, as the Ninth Circuit emphasized in holding Section 2614's statute of limitations provision non-jurisdictional, the provision uses the "non-mandatory" term "may" and is therefore "far more permissive than several limitations provisions that have been held amenable to equitable tolling." *Merritt v. Countrywide Financial Corp.*, 759 F.3d 1023, 1037 (9th Cir. 2014) (citing *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 438–39 (2011)).

Decades prior to the Supreme Court's recent effort "to 'ward off profligate use of' the label 'jurisdictional,'" *Nauflett v. C.I.R.*, 892 F.3d 649, 652 (4th Cir. 2018) (quoting *Sebelius*, 568 U.S. at 153), the D.C. Circuit held that Section 2614's limitations period was jurisdictional, principally because Congress titled the section: "Jurisdiction of Courts; limitations," *see Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1041 (D.C. Cir. 1986). We do not believe the reference to "Jurisdiction" in the title of Section 2614 bears the interpretive weight placed on it in *Hardin*, nor does it constitute the "clear statement" necessary to render Section 2614's limitations provision jurisdictional. To begin, it is significant that the plain language of the Section 2614's title references both "Jurisdiction" and "limitations," indicating that Congress viewed the limitations aspect of Section 2614 as distinct from the provision's "jurisdiction[al]" aspect. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 163–64 (2010) (rejecting the argument that the "presence of the word 'jurisdiction'" in a statute renders the entire statute jurisdictional).

Additionally, we note that "'[j]urisdiction . . . is a word of many, too many, meanings,'" only some of which refer to a "court's adjudicatory authority"—the crucial question in determining whether a statute of limitations is subject to tolling on equitable grounds. *Kontrick v. Ryan*, 540 U.S. 443, 454–55 (2004) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). Section 2614's reference to "jurisdiction" "is not a 'jurisdiction-*granting* provision'"—it does not create a court's adjudicatory authority—but rather deals with "venue" and therefore does not preclude tolling on equitable grounds. *Merritt*, 759 F.3d at 1038 (quoting *Reed Elsevier*, 559 U.S. at 166) (emphasis retained).

We further note that "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act," *see Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 427 (1965), also support treating the limitations period in Section 2614 as non-jurisdictional. Congress enacted RESPA to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). In so doing, Congress sought to provide consumers "with greater and more timely information on the nature and costs of the settlement process" so that they may be "protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." *Id.* § 2601(a). As the Eleventh Circuit observed in construing a limitations provision in the Truth In Lending Act, which also serves to protect consumers from abusive practices by entities that originate and service mortgages, treating the limitations provision as jurisdictional

17

"would lead to the anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy. We cannot believe this was Congress' intent." *Ellis v. GMAC*, 160 F.3d 703, 708 (11th Cir. 1998) (finding the Truth In Lending Act statute of limitations non-jurisdictional).

This reasoning applies equally to RESPA, which uses a "similarly worded" limitations provision and serves analogous "consumer-protection purposes." *Merritt*, 759 F.3d at 1038 (internal quotation marks omitted). As one district court in this circuit correctly observed, "[s]urely RESPA . . . [was] directed at the best as well as the worst of swindlers." *Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787, 793 (D. Md. 1998). We do not believe that Congress intended to allow individuals and entities that conceal their unlawful kickback schemes and other RESPA violations to reap the benefit of the statute of limitations as a defense. On the contrary, allowing tolling based on fraudulent concealment advances the goals Congress sought to serve in enacting RESPA. Therefore, we join the majority of our sister circuits and hold that the statute of limitations found in Section 2614 is not jurisdictional in nature and may be tolled based on equitable grounds, including fraudulent concealment. *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 400 n.20 (3d Cir. 2015); *Merritt*, 759 F.3d at 1036–39; *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166–67 (7th Cir. 1997).

B.

Having determined that RESPA's one-year statute of limitations is subject to tolling on equitable grounds—including fraudulent concealment—we turn to whether the district court applied the proper test in holding that Plaintiffs failed to adequately allege their entitlement to tolling based on fraudulent concealment. This Court long has held that to toll a limitations period based on fraudulent concealment, "a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Marlinton*, 71 F.3d at 122 (citing *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974)). This Court has repeatedly and consistently applied that three-part framework when a plaintiff sought to invoke fraudulent concealment to toll a limitations period, including as recently as April 2018. *See, e.g.*, *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 107–08 (4th Cir. 2018); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 370 (4th Cir. 2014); *Go Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541 (4th Cir. 1997); *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987).

Notwithstanding this unbroken line of precedent—which the district court followed in *Fangman*—the district court this time applied a different framework in analyzing the sufficiency of Plaintiffs' *fraudulent concealment* allegations: the Supreme Court's two-step test for determining whether a plaintiff is entitled to *equitable tolling* of a statute limitations. Under that test—which the Supreme Court most recently applied in

19

*Menominee Indian Tribe v. United States*, but which dates, at least, to the Court's decision in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990)—a plaintiff seeking relief from a limitations period based on "equitable tolling" must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing," *Edmondson*, 2018 WL 582514, at *4–5 (quoting *Menominee*, 136 S. Ct. at 755).

Contrary to the district court's reasoning, we conclude that the two-step test the Supreme Court applied in *Menominee* did not displace this Court's three-step test for determining whether a plaintiff is entitled to relief from a limitations period based on fraudulent concealment. To understand why, it is necessary to recognize the "subtle and difficult" differences between the various equitable doctrines that potentially afford plaintiffs relief from a limitations period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 192 (1997); *cf. Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002) (noting that "[t]he taxonomy of tolling, in the context of avoiding a statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel").

The first equitable doctrine that provides for tolling of a limitations period— referred to most commonly as "fraudulent concealment"—"prevents a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until' the defendant 'could plead the statute of limitations to protect it.'" *Marlinton*, 71 F.3d at 122 (quoting *Bailey v. Glover*, 88 U.S. 342, 349 (1874)). Put differently, the fraudulent concealment tolling doctrine applies in situations "where the defendant has wrongfully

20

deceived or misled the plaintiff in order to conceal the existence of a cause of action." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987). The purpose of fraudulent concealment doctrine is to "ensur[e] that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Marlinton*, 71 F.3d at 125. Under this doctrine, because of the defendant's wrongful acts of concealment, the plaintiff is not aware of the facts giving rise to his claim within the limitations period.

The second equitable doctrine that provides for tolling of a limitations period— referred to most commonly as "equitable estoppel"—applies "where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." *English*, 828 F.2d at 1049. Equitable estoppel differs from fraudulent concealment in that, unlike with fraudulent concealment, the plaintiff *is* aware of his claim within the limitations period. The plaintiff's failure to timely file his claim derives not from his ignorance of the cause of action, but rather from conduct taken by the defendant to induce the plaintiff not to timely file his claim. For example, equitable estoppel might apply if a plaintiff did not timely file suit because the defendant "promis[ed] not to plead the statute of limitations" as a defense if the plaintiff held off on filing suit during settlement negotiations. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir. 1990).

The third equitable doctrine that allows a plaintiff to avoid a statute of limitations—referred to most frequently as "equitable tolling"—"focuses on whether there was excusable delay by the plaintiff." *Johnson v. Henderson*, 314 F.3d 409, 414

21

(9th Cir. 2002) (internal quotation marks omitted). Equitable tolling is appropriate "in those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc) (internal quotation marks omitted). For example, equitable tolling may be available when a plaintiff's attorney engages in "serious misconduct" such as "ma[king] misrepresentations to the [plaintiff], disregard[ing] the [plaintiff's] instructions, refus[ing] to return documents, or abandon[ing] the [plaintiff's] case." *Downs v. McNeil*, 520 F.3d 1311, 1321–22 (11th Cir. 2009) (collecting cases). Critically, however, equitable tolling "differs from [fraudulent concealment and equitable estoppel] in that it does not assume a wrongful—or any—effort by the defendant to prevent the plaintiff from suing." *Cada*, 920 F.2d at 451; *see also Shropshear v. Corp. Counsel of City of Chicago*, 275 F.3d 593, 597 (7th Cir. 2001) (characterizing "tolling of the statute of limitations . . . on the basis of *defendant misconduct*" as "the domain of fraudulent concealment and equitable estoppel" (emphasis added)).

As the Supreme Court has recognized, opinions have not always used consistent or precise terminology to distinguish these three tolling doctrines. *See Klehr*, 521 U.S. at 194 (noting that "some courts have said [fraudulent concealment] 'equitably tolls' the running of a limitations period . . . while other courts have said it is a form of 'equitable estoppel'") (internal citation omitted). For example, notwithstanding that the doctrine we term "equitable tolling" substantively differs from fraudulent concealment and equitable estoppel, some opinions characterize all three doctrines as falling under the overarching

22

heading of "equitable tolling" because each of the three doctrines tolls a limitations period on equitable grounds. *See, e.g.*, *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994), *abrogated on other grounds as recognized by Rotkiske v. Klemm*, 890 F.3d 422,427–28 (3d Cir. 2018). Likewise, other opinions characterize fraudulent concealment as a subcategory of equitable estoppel because, like the doctrine we term "equitable estoppel," fraudulent concealment tolls a limitations period when a defendant's misconduct precluded a plaintiff from timely filing its claims. *See, e.g.*, *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) ("Equitable estoppel . . . focuses primarily on actions taken by the *defendant* to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.'" (emphasis in original)); *Shropshear*, 275 F.3d at 597 (describing "fraudulent concealment" as "one instantiation" of "equitable estoppel").

Although courts have not always agreed on a uniform *terminology* for labeling the various doctrines for tolling a limitations period on equitable grounds—which failure has led to some "confus[ion]," *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182 (2d Cir. 2008)—the Supreme Court, lower courts, and commentators agree that the three doctrines are *substantively* different and therefore subject to different pleading and proof standards. *See Klehr*, 521 U.S. at 192 (characterizing "equitable tolling" and "equitable estoppel" as "different limitations doctrines"); *Johnson*, 314 F.3d at 413–14; *Pearl*, 296 F.3d at 81; *Oshiver*, 38 F.3d at 1387; 4 Charles Alan Wright, Arthur R. Miller & Adam N. Steinman, Fed. Prac. & Proc. § 1056 (4th ed. 2015) (distinguishing "equitable tolling," "equitable estoppel," and "fraudulent concealment" and noting that fraudulent

concealment "[m]ingl[es] elements from both the doctrines of equitable tolling and equitable estoppel").

Once one recognizes these substantive differences, the district court's error in applying *Menominee's* two-part framework is apparent. *Menominee* deals not with "fraudulent concealment"—the tolling doctrine Plaintiffs seek to invoke. Rather, *Menominee*—and the earlier Supreme Court decisions *Menominee* follows in applying its two-part test—involves the tolling doctrine that is potentially applicable when a plaintiff's failure to timely file suit is *not* attributable wrongful conduct by the defendant—the tolling doctrine this opinion terms "equitable tolling."

In *Menominee*, for example, the Supreme Court considered whether the Menominee Indian Tribe of Wisconsin (the "Tribe") could rely on "equitable tolling to preserve contract claims not timely presented to a federal contracting officer." 136 S. Ct. at 753. The Tribe did not timely present its contract claims to a federal contracting officer because the Tribe (mistakenly) believed (1) that it was the member of a proposed class in an earlier-filed putative class action related to the same alleged wrongdoing and, therefore, (2) that the Tribe's claim was eligible for class-action tolling. *Id.* at 755. Put differently, the Tribe sought "equitable tolling" based on *its* mistaken belief that it was eligible for class-action tolling, despite knowing of its contract claims. *Id.* at 756–57.

Applying the two-part test under which a plaintiff must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing," the Supreme Court held that the Tribe was not entitled to equitable tolling. *Id.* at 755–57 (quoting *Holland v. Florida*, 560 U.S. 631,

24

649 (2010)). In particular, the Court held that the Tribe failed to satisfy the "extraordinary circumstances" element because the Tribe's "mistaken reliance on the putative . . . class action was not an obstacle beyond its control." *Menominee*, 136 S. Ct. at 756. "This mistake was fundamentally no different from a garden variety claim of excusable neglect . . . such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline," and was thus insufficient to meet the "extraordinary circumstances" standard, the Court reasoned. *Id.* at 757 (internal quotation marks and citations omitted).

*Menominee*, therefore, involved the tolling doctrine this opinion terms "equitable tolling." The Tribe sought relief based on *its* mistake. Unlike Plaintiffs' invocation of the fraudulent concealment tolling doctrine, the Tribe did not contend that the defendant was in any way responsible for the Tribe's failure to timely file its action.

Notably, all the precedent that *Menominee* relied on in applying its two-part "equitable tolling" test presented the same scenario—a plaintiff seeking tolling of a limitations period on grounds that did not involve misconduct by the defendant. *See Holland*, 560 U.S. at 634 (addressing whether a habeas petitioner was entitled to equitable tolling based on *his attorney*'s unprofessional conduct); *Lawrence v. Florida*, 549 U.S. 327, 336–37 (2007) (addressing whether a habeas petitioner was entitled to equitable tolling based on, among other grounds, purported "legal confusion" as to whether the relevant limitations period was tolled by the filing of a certiorari petition and *his counsel's* "mistake in miscalculating the limitations period"); *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (addressing whether a habeas petitioner was entitled to equitable tolling because "'state law and Third Circuit exhaustion law created a trap' on

25

which he detrimentally relied"); *Irwin*, 498 U.S. at 96 (addressing whether plaintiff in employment action was entitled to equitable tolling "because *his lawyer* was absent from his office at the time the [Equal Employment Opportunity Commission] notice was received" (emphasis added)). None of these cases involved a plaintiff seeking tolling based on fraudulent concealment—the tolling doctrine that applies when a defendant's wrongful conduct prevents a plaintiff from learning of the facts necessary to assert a claim within the limitations period—the form of tolling at issue here.

Because *Menominee* dealt with a different tolling doctrine, it could not—and did not—abrogate this Court's long-standing three-step test for determining whether a plaintiff is entitled to relief from a limitations period based on fraudulent concealment. *See Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." (internal quotation marks omitted)). That this Court has applied *Marlinton*'s three-step framework in assessing fraudulent concealment claims numerous times *after* the Supreme Court first adopted the two-step test applied in *Menominee*—including after *Menominee* itself—further demonstrates that fraudulent concealment differs from the form of equitable tolling at issue in *Menominee*. *See SD3*, 888 F.3d at 107–08; *EQT Prod.*, 764 F.3d at 370; *Go Computer*, 508 F.3d at 178. Tellingly, none of these prior fraudulent concealment opinions discuss, much less apply, the two-step test applied in *Menominee*.

Equally tellingly, none of the cases the Lenders cite as establishing the applicability of *Menominee* to Plaintiffs' request for tolling on equitable grounds dealt with alleged fraudulent concealment; rather, each case deals with the tolling doctrine this opinion terms "equitable tolling." *See Cunningham v. C.I.R.*, 716 Fed. App'x 182, 185 (4th Cir. 2018) (seeking "equitable tolling" based on the plaintiff's "miscalculation of the filing deadline [that] may well have been an innocent mistake"); *Knaupf Installation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 907–10 (7th Cir. 2016) (requesting equitable tolling when plaintiff, through no fault of the defendant, did not "realiz[e] that it been removed from the class" of a previously filed class action and, therefore, that it was no longer entitled to class action tolling); *Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971–72 (11th Cir. 2016) (applying the *Menominee* test because the plaintiff did not allege that the defendant "actively misled him").

In sum, we hold that *Menominee* does not supplant this Court's long-standing three-step framework for analyzing allegations of fraudulent concealment. Accordingly, the district court committed legal error when it applied *Menominee*'s two-step framework and dismissed Plaintiffs' action for failing to satisfy the "extraordinary circumstances" element.[5]

---

[5] Even if *Menonminee*'s "extraordinary circumstances" element was a component of the fraudulent concealment analysis—which it is not—a defendant's fraudulent concealment of its wrongdoing would seem to constitute *per se* "extraordinary circumstances." *See Menominee*, 136 S. Ct. at 757 (stating that "relying on *actually binding* precedent that is subsequently reversed" or other "obstacle[s] beyond [a plaintiff's] control" could constitute "extraordinary circumstances," whereas "garden variety . . . excusable neglect" and "simple miscalculation" would not); *see also Harris*, (Continued)

C.

Having concluded that this Court's three-step test for determining whether a plaintiff is entitled to invoke the doctrine of fraudulent concealment continues to apply, we now turn to whether Plaintiffs' allegations bearing on fraudulent concealment are sufficient to survive a motion to dismiss under Rule 12(b)(6).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although it is true that the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." *Hall v. DirecTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (internal quotation marks omitted).

Additionally, under Rule 9(b) "a party must state with particularity the circumstances constituting fraud or mistake," including Plaintiffs' allegations bearing on the Lenders' alleged fraudulent concealment. To satisfy Rule 9(b), a plaintiff must plead

209 F.3d at 330 (noting that in the absence of allegations of wrongful conduct by the defendant, the plaintiff "must be able to point to some *other* extraordinary circumstance beyond his control that prevented him from complying with the statutory time limit" (emphasis added)). Put simply, a defendant's affirmative effort to conceal its wrongdoing in a manner that prevents a plaintiff from learning the facts necessary to allege a cause of action within the limitations period amounts to circumstances "external" to the plaintiff's control in which it would be "unconscionable to enforce the limitation period against the [plaintiff] and gross injustice would result." *Whiteside*, 775 F.3d at 184 (internal quotation marks omitted).

"the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)). Nevertheless, a court "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*

To satisfy the first element of the fraudulent concealment test, a plaintiff must "provide evidence of affirmative acts of concealment" by the defendants. *Marlinton*, 71 F.3d at 126. "Those acts, however, need not be separate and apart from the acts of concealment," but instead "may include acts of concealment involved in the [alleged] violation itself." *Id.* A plaintiff satisfies its burden to allege an affirmative act of concealment if, for example, it alleges that the defendant employed "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446–47 (6th Cir. 2012) (internal quotation marks omitted).

Here, Plaintiffs allege, with particularity, several "trick[s] or contrivance[s]" Genuine Title and the Lenders employed to conceal the alleged unlawful kickback scheme. Plaintiffs allege that both Genuine Title and the Lenders created and used "sham" entities to channel the allegedly unlawful cash kickbacks—entities that, in many cases, shared the same registered agent and address as Genuine Title. *E.g.*, J.A. 18–20,

29

23, 26. The complaints allege the names of the sham entities, the broker or loan officer connected to each sham entity, and the dates Genuine Title allegedly funneled kickback payments through the entities. The use of sham entities to conceal the source and flow of the kickback payments constitutes an affirmative act of concealment. *Reiser v. Residential Funding Corp.*, 420 F. Supp. 2d 940, 947 (S.D. Ill. 2004) (holding that alleged use of "sham entity . . . to funnel secret kickbacks" constituted an affirmative act of concealment in RESPA case), *rev'd in part on other grounds by* 380 F.3d 1027 (7th Cir. 2004); *cf. United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003) ("The creation and use of sham businesses is highly relevant to the proof of concealment money laundering.").

The complaints further allege that, after regulators began investigating the kickback scheme, the Lenders' brokers and loan officers entered into "sham" Title Services Agreements and "back-dated" those agreements to further disguise the kickback scheme. J.A. 16–17. As with the Lenders' alleged use of sham business entities, the alleged creation of sham business agreements—such as the "back-dated" agreements at issue here—constituted an affirmative act of concealment. *See GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-cv-24431, 2018 WL 1393790, at *23 (S.D. Fla. Jan. 26, 2018); *cf. State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) ("The passing off of a sham article as one that is genuine is an inherently self-concealing fraud.").

Finally, Plaintiffs allege the Lenders concealed their kickback scheme by not reporting the payments on Plaintiffs' required HUD-1 Settlement Statements,

notwithstanding that governing regulations *required* reporting such payments. As the Third Circuit has recognized, omitting required information from the HUD-1 Settlement Statement form can constitute an affirmative act of concealment for purposes of the fraudulent concealment tolling doctrine. *See In re Comm. Bank of N. Va. Mortg. Lending Practices Lit.*, 795 F.3d 380, 403 (3d Cir. 2015) ("[I]nclusion of misleading information in a HUD-1 can constitute an independent act of concealment.").

When taken as true for purposes of a motion to dismiss—as we must—these are adequate factual allegations of acts of concealment. Notably, the district court in *Fangman* reached exactly that conclusion when it considered substantively indistinguishable factual allegations. *See Fangman*, 2016 WL 6600509, at *6.

Having concluded that Plaintiffs satisfied their burden to allege affirmative acts of concealment, the remaining question is whether Plaintiffs exercised due diligence to uncover the facts supporting their claims and yet failed to uncover such facts within the limitations period. *See Marlinton*, 71 F.3d at 122. Generally, whether a plaintiff exercised due diligence is a jury issue not amenable to resolution on the pleadings or at summary judgment. *See, e.g.*, *TCF Nat. Bank v. Market Intelligence, Inc.*, 812 F.3d 701, 711 (8th Cir. 2016) ("Generally, fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment." (internal quotation omitted)); *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) ("[T]he issue of when a plaintiff in the exercise of due diligence should have known of the basis of his claims is not an appropriate question for summary judgment."); *Carrier Corp.*, 673 F.3d at 448–49 (declining to dismiss on the pleadings fraudulent concealment

31

claim on lack of diligence grounds); *see also Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) ("[B]ecause the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6).").

Although the district court did not decide whether Plaintiffs' complaints sufficiently alleged diligence, *see Edmondson*, 2018 WL 582514, at *6, the Lenders principally argue that Plaintiffs cannot satisfy the diligence requirement because Plaintiffs conceded that they did not engage in any inquiry during the limitations period. But this Court long has held that "it is possible for a plaintiff to satisfy [the due diligence requirement] without demonstrating that it engaged in any specific inquiry." *Marlinton*, 71 F.3d at 128. "If the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry on its part"—if the plaintiff was not on inquiry notice—"then there is nothing to provoke inquiry." *Id.*[6]

As explained above, *Marlinton* continues to set forth this Court's controlling test for determining whether a plaintiff is entitled to tolling based on fraudulent concealment. *See supra* Part II.B. In accordance with *Marlinton*, Plaintiffs allege that they "did not and could not have known about the Kickback Scheme, due to Genuine Title and [the

---

[6] By contrast, if a plaintiff is "aware of facts that should have excited further inquiry," then, so long as the plaintiff engages in "reasonable further inquiry," the limitations period is tolled—and therefore does not begin to run—until such an inquiry would have revealed sufficient facts for the plaintiff to state a claim that would survive a motion to dismiss. *Marlinton*, 71 F.3d at 128; *see also SD3*, 888 F.3d at 112 (holding that a plaintiff is on notice when it is aware (or should have been aware) of "enough factual information from which [the plaintiff] could plead their cause of action for Rule 12(b)(6) purposes").

Lenders'] efforts to conceal the kickbacks from Plaintiff, Class Members, and regulators, until contacted by . . . counsel on or about April 20, 2016." J.A. 18. Likewise, Plaintiffs further allege that "[n]o reasonable borrower diligence or investigation would have uncovered the fact, mechanics, and extent of this illegal kickback scheme until contacted by counsel." J.A. 185–86.

Nevertheless, the Lenders argue that several pieces of public information should have "excited further inquiry" by Plaintiffs, *Marlinton*, 71 F.3d at 128—private litigation, including *Fangman*, related to Genuine Title's RESPA violations; the Consumer Financial Protection Bureau's and Maryland Attorney General's enforcement actions against Genuine Title, Wells Fargo, and J.P. Morgan; and media coverage of those enforcement actions. Given that the adequacy of a plaintiff's diligence is generally not amenable to resolution on the pleadings, we conclude that none of these pieces of information precluded Plaintiffs' from meeting their pleading stage burden as to the diligence element of the fraudulent concealment test.

To be sure, the filing of similar lawsuits against the same defendant "may in some circumstances suffice to give notice" of possible claims. *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979). In other circumstances, however, "the mere availability of open and readily accessible public records"—such as legal filings—"may not suffice by itself to defeat a fraudulent-concealment claim," particularly if a plaintiff lacks "ample reason to look at these records." *Ruth v. Unifund CCR Ptrs.*, 604 F.3d 908, 911 (6th Cir. 2010).

Regarding *Fangman* in particular, only two of the Lenders (Eagle Bank and Bank of America) were ever parties to that litigation. And Eagle Bank and Bank of America were dismissed from the *Fangman* litigation in its early stages. *See J. v. Genuine Title, LLC*, 2015 WL 8315704, at *1. Indeed, the *Fangman* plaintiffs voluntarily withdrew their claims against Bank of America before the court ruled on Bank of America's motion to dismiss. *Id.* at *1 n.6. It is difficult to imagine that Plaintiffs in this action could have accessed—or did access—the relevant filings, orders, and opinions in *Fangman*, all of which were unpublished and accessible only through a LexisNexis, WestLaw, or a PACER account. And the motion to dismiss record before this Court includes no evidence that any aspect of the *Fangman* proceedings was publicized, let alone publicized in a media outlet regularly consulted by a Plaintiff, meaning that this record is devoid of any "reason [for a Plaintiff] to look at these records." *Ruth*, 604 F.3d at 911.

In the absence of such information, we decline to hold the *Fangman* litigation, as a matter of law, placed Plaintiffs on inquiry notice. Put simply, the fraudulent concealment doctrine requires *reasonable* diligence; it does not necessarily hold individual borrowers to the diligence standard of combing court filings in potentially related cases, particularly when the borrower has no reason to be aware of the related cases. Additionally, to the extent any Plaintiff was, or should have been aware, that Eagle Bank and Bank of America were parties to the *Fangman* litigation, the two Lenders' early dismissal may have led that Plaintiff to reasonably believe that Eagle Bank and Bank of America were not involved in the alleged wrongdoing.

34

Unlike with the *Fangman* litigation, the Consumer Financial Protection Bureau's and Maryland Attorney General's enforcement actions against Genuine Title, Wells Fargo, and J.P. Morgan *were* publicized, both through agency press releases and in newspaper articles in the *Baltimore Sun* and the *Washington Post* (albeit, on pages 12A and A14 of those papers, respectively). But whereas two of the Lenders were (briefly) party to the *Fangman* proceedings, *none* of the Lenders in this case were parties to the federal and state enforcement proceedings, nor were any of the Lenders mentioned in the newspaper articles discussing those enforcement proceedings. "[N]otice of one wrong by a defendant" does not necessarily "trigger[] a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing." *Morton's Market*, 198 F.3d at 834. Just because Genuine Title engaged in an illegal kickback scheme with brokers and loan officers employed by certain lenders does not establish, for purposes of a motion to dismiss under Rule 12(b)(6), that a reasonable borrower would have suspected that Genuine Title provided such kickbacks to brokers and loan officers employed by other lenders. *See In re Cmty. Bank*, 795 F. 3d at 404 ("Due diligence does not mean that borrowers must presume their bank is lying or dissembling and therefore that further investigation is needed.").

More significantly, the limited record before this Court is devoid of evidence suggesting—much less proving—that any Plaintiff had access to, or read, the press releases or the newspaper articles that the Lenders maintain placed Plaintiffs on inquiry notice. The absence of such evidence sets this case apart from the cases relied on by the Lenders in which a court found publicly available information placed a plaintiff on

inquiry notice. For instance, in *Pomeroy v. Schlegel Corp.*, 780 F. Supp. 980 (W.D.N.Y. 1991), the plaintiff sought relief from the limitations period in a securities fraud case based on fraudulent concealment, *id.* at 983. Following discovery, the defendant moved for *summary judgment* on grounds that plaintiff was on inquiry notice—but failed to engage in a reasonable investigation—based on a newspaper article discussing an earlier-filed lawsuit alleging the same fraud. *Id.* at 981. The district court held that, under the undisputed facts, the plaintiff was on inquiry notice because the plaintiff admitted during his deposition that he read the specific newspaper article discussing the related lawsuit. *Id*. at 983 ("Mr. Pomeroy had inquiry notice of Schlegel's alleged fraudulent concealment when he read about the *Hickman* lawsuit.").

Likewise, in *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245 (1st Cir. 1996), the plaintiff employee benefit plan sought to invoke fraudulent concealment to avoid the limitations period in a fraud and breach of fiduciary duty case against the investment manager for a retirement plan, *id.* at 1255–56. The plaintiff alleged the investment manager made "material oral and written misrepresentations regarding the value and safety of the investments, the amount of profit generated by the trades, and the amounts of commissions charged." *Id.* at 1256. The First Circuit held that the district court properly awarded *summary judgment* to the investment manager on limitations grounds, holding that the undisputed evidence established that the plaintiff received several investment prospectuses from the investment manager that, coupled with the investment manager's public statements,

provided the plaintiff with "sufficient storm warnings of the alleged misrepresentations and the possibility of fraud" to place the plaintiff on inquiry notice. *Id.*

Similarly, in *Cunningham v. M&T Bank Corp.*, 814 F.3d 156 (3d Cir. 2016), the plaintiff sought relief from the limitations period based on fraudulent concealment in a RESPA case alleging that the defendant bank used a reinsurance program that allegedly constituted an unlawful fee-splitting agreement, *id.* at 161. The Third Circuit held that the district court properly awarded the defendant *summary judgment* on limitations grounds. *Id.* at 158. The plaintiffs could not rely on fraudulent concealment, the court reasoned, because the plaintiffs received and signed documents during the closing of their mortgages that disclosed and explained the allegedly unlawful reinsurance arrangement, yet "took no steps to investigate" whether the arrangement violated RESPA. *Id.* at 161–62; *see also Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009) (rejecting a request for tolling based on fraudulent concealment in a RESPA case when a document *signed by the plaintiffs at closing* disclosed the alleged kickback).

Whereas the summary judgment record in *Pomeroy*, *J. Geils Band*, and *Cunningham* established that the plaintiff read or received the specific article or document that placed the plaintiff on inquiry notice, here the record is devoid of any evidence that any Plaintiff read, or even received, the press releases or newspaper articles

that the Lenders claim placed Plaintiffs on inquiry notice. Accordingly, at this early stage of the proceedings, *Pomeroy*, *J. Geils Band*, and *Cunningham* are inapposite.[7]

In rejecting the Lenders' assertion that Plaintiffs were on inquiry notice based on the state and federal enforcement actions and media coverage of those actions, we also find it significant that several of the decisions relied on by the Lenders for the proposition that publicly available information can place a plaintiff on inquiry notice involved plaintiffs that were sophisticated business entities, as opposed to consumers. For example, *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975), involved an antitrust action by a defunct tire manufacturer, Dayco, that alleged it was forced out of the market as a result of a price-fixing scheme orchestrated by two other tire manufacturers, *id.* at 390. The Sixth Circuit held that Dayco could not obtain relief from the limitations period based on fraudulent concealment because congressional hearings and a Federal Trade Commission suit had described some of the violations alleged in Dayco's complaint more than a decade before Dayco filed suit. *Id.* at 394. Those

---

[7] As part of its analysis of *Menominee*'s (inapplicable) "extraordinary circumstances" element, the district court relied heavily on the fact that "[i]n June 2015, Plaintiff[s'] counsel had access to Genuine Title's buyers' names, addresses, telephone numbers, property addresses, settlement dates, lender and in some cases mortgage broker information." *Edmondson*, 2018 WL 582514, at *6. But counsel did not contact Plaintiffs to inform them of their potential claims—and become Plaintiffs' counsel—until a year later. The notice component of *Marlinton*'s three-prong test focus on the information known to the *plaintiff*, not the plaintiff's counsel. To be sure, once a plaintiff hires counsel to investigate a claim, it may be appropriate to impute the counsel's knowledge to the plaintiff. But until that point, a plaintiff cannot be charged with the knowledge of his yet-to-be-retained counsel. We know of no opinion holding otherwise, nor have the Lenders identified any such opinion.

proceedings "should have aroused Dayco's suspicions, and its failure to investigate further at that time was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine." *Id.* Likewise, the First Circuit held that the investment prospectuses placed the plaintiff employee benefit plan on inquiry notice of its fraud and breach of fiduciary duty claims against the defendant investment manager. *See J. Geils Band*, 76 F.3d at 1256–57.

In short, "[i]nquiry notice . . . charges a person to investigate when the information at hand would have prompted a *reasonable* person to do so." *Go Computer*, 508 F.3d at 178 (emphasis added). Thus, the Sixth Circuit in *Dayco Corp.* held that one should expect a *reasonable tire manufacturer* to be aware of enforcement actions and congressional investigations into the tire manufacturer's competitors, and the First Circuit in *J. Geils Band* held that one should expect a *reasonable employee benefit plan* to review the investment prospectuses it receives from its investment manager.

But what constitutes reasonable conduct for one type of plaintiff may not constitute reasonable conduct for another type of plaintiff. *See Morton's Market*, 198 F.3d at 832. Such is particularly true in determining whether one would expect a *reasonable residential mortgage borrower* to keep abreast of all enforcement actions related to the mortgage lending and title services industries. We believe that issue should be decided by the finder of fact and is not amenable to resolution on the pleadings or at summary judgment.

* * * * *

In sum, Plaintiffs sufficiently pleaded that the Lenders engaged in affirmative acts of concealment. And based upon the limited record before this Court, we cannot conclude as a matter of law that these Plaintiffs unreasonably failed to discover or investigate the basis of their claims within the limitations period.

III.

For the reasons stated above, the district court erred in holding that the two-element test applied in *Menominee* abrogated this Court's long-standing three-element test for determining whether a plaintiff is entitled to relief from a limitations period based on the fraudulent concealment tolling doctrine. Applying the proper test, we hold that Plaintiffs' allegations as to fraudulent concealment are sufficient to withstand the Lenders' motions to dismiss.[8]

Accordingly, we reverse the judgment of the district court and remand this case for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED*

---

[8] Defendant Bank of America further argues that the complaint against it should be dismissed because the plaintiffs "failed to adequately plead valid claims under RESPA." Appellee's Br. at 60. The district court did not address this argument in its motion-to-dismiss opinion, and, therefore, we decline to exercise our discretion to address it in the first instance.