**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1465**

───────────

SUSAN SCHARPF; ANTHONY D'ARMIENTO, on behalf of themselves and all others similarly situated,

Plaintiffs - Appellants,

v.

GENERAL DYNAMICS CORP.; BATH IRON WORKS CORP.; ELECTRIC BOAT CORP.; GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC.; HUNTINGTON INGALLS INDUSTRIES, INC.; NEWPORT NEWS SHIPBUILDING AND DRY DOCK CO.; INGALLS SHIPBULIDING, INC.; HII MISSION TECHNOLOGIES CORP.; HII FLEET SUPPORT GROUP LLC; MARINETTE MARINE CORPORATION; BOLLINGER SHIPYARDS, LLC; GIBBS & COX, INC.; SERCO, INC.; CACI INTERNATIONAL, INC.; THE COLUMBIA GROUP, INC.; THOR SOLUTIONS, LLC; TRIDENTIS, LLC; FASTSTREAM RECRUITMENT LTD.,

Defendants - Appellees.

-------------------------------

COMMITTEE TO SUPPORT THE ANTITRUST LAWS,

Amicus Supporting Appellants.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:23–cv–01372–AJT–WEF)

───────────

Argued:  January 29, 2025                                        Decided:  May 9, 2025

───────────

Before DIAZ, Chief Judge, and WYNN and BENJAMIN, Circuit Judges.

————————

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Benjamin joined. Chief Judge Diaz wrote a dissenting opinion.

————————

**ARGUED:** Robert White Cobbs, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Appellants. Matthew S. Hellman, JENNER & BLOCK, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Brent W. Johnson, Steven J. Toll, Alison S. Deich, Zachary R. Glubiak, Sabrina S. Merold, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.; Shana E. Scarlett, Rio S. Pierce, Sarah Dupree, Berkeley, California, Steve W. Berman, Seattle, Washington, Kevin K. Green, San Diego, California, Elaine T. Byszewski, HAGENS BERMAN SOBOL SHAPIRO LLP, Pasadena, California; George F. Farah, Nicholas Jackson, New York, New York, Simon Wiener, HANDLEY FARAH & ANDERSON PLLC, Boston, Massachusetts; Candice J. Enders, Julia R. McGrath, BERGER MONTAGUE PC, Philadelphia, Pennsylvania; Brian D. Clark, Stephen J. Teti, Arielle S. Wagner, Eura Chang, LOCKRIDGE GRINDAL NAUEN P.L.L.P., Minneapolis, Minnesota, for Appellants. Adam Block Schwartz, Todd Stenerson, David Higbee, Djordje Petkoski, Joseph Paul Samuels, ALLEN OVERY SHEARMAN STERLING US LLP, Washington, D.C.; Sima Namiri-Kalantari, Los Angeles, California, Chahira Solh, CROWELL & MORING LLP, Irvine, California, for Appellees Huntington Ingalls Industries, Inc.; HII Fleet Support Group LLC; HII Mission Technologies Corp., Ingalls Shipbuilding, Inc.; and Newport News Shipbuilding and Dry Dock Co. John F. Terzaken, III, Abram J. Ellis, SIMPSON THACHER & BARTLETT LLP, Washington, D.C.; Allison W. Reimann, Madison, Wisconsin, Sean O'D. Bosack, Christie B. Carrino, GODFREY & KAHN, S.C., Milwaukee, Wisconsin, for Appellee Marinette Marine Corp. Perry Lange, Jennifer Milici, John W. O'Toole, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellee Gibbs & Cox, Inc. William T. DeVinney, BRIGLIA HUNDLEY, P.C., Tysons Corner, Virginia, for Appellee The Columbia Group, Inc. William Lawler, Amanda C. DeLaPerriere, BLANK ROME LLP, Washington, D.C., for Appellee Tridentis, LLC. Douglas E. Litvak, Elizabeth B. Deutsch, Washington, D.C., Michael A. Doornweerd, Gabriel K. Gillett, JENNER & BLOCK LLP, Chicago, Illinois; David G. Barger, GREENBERG TRAURIG, LLP, McLean, Virginia, for Appellees Bath Iron Works Corp.; Electric Boat Corp.; General Dynamics Corp.; and General Dynamics Information Technology, Inc. Attison L. Barnes, III, Krystal B. Swendsboe, Scott M. McCaleb, Jon W. Burd, Daniel T. Park, WILEY REIN LLP, Washington, D.C., for Appellee Bollinger Shipyards, LLC. Benjamin L. Hatch, Casey Erin Lucier, Washington, D.C., J. Brent Justus, Nicholas J. Giles, Joshua D. Wade, W. Cole Geddy, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee Serco, Inc. Christopher C. Brewer, Ryan P. Phair, Michael F. Murray, Craig Y. Lee, PAUL HASTINGS LLP, Washington, D.C., for Appellee CACI International Inc. Matthew J. MacLean, Alvin Dunn, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., for Appellee Thor Solutions, LLC. Kellie Lerner, ROBINS KAPLAN LLP, New

2

York, New York; David M. Cialkowski, ZIMMERMAN REED LLP, Minneapolis, Minnesota; Anthony J. Stauber, Bailey Twyman-Metzger, GUSTAFSON GLUEK PLLC, Minneapolis, Minnesota, for Amicus Curiae.

WYNN, Circuit Judge:

Plaintiffs Anthony D'Armiento and Susan Scharpf brought a putative class action against the nation's largest shipbuilders and naval-engineering consultancies, alleging a wide-ranging "no-poach" conspiracy in which the companies formed a "gentlemen's agreement" not to recruit each other's employees in an effort to drive down wages. As no named Plaintiff has worked for any Defendant since 2013, the district court dismissed the case as barred by the Sherman Act's four-year statute of limitations. The court concluded that a "non-ink-to-paper" agreement cannot constitute an affirmative act of fraudulent concealment, so it does not toll the limitations period.

We hold that neither logic nor our precedent supports distinguishing between defendants who destroy evidence of their conspiracy and defendants who carefully avoid creating evidence in the first place. Accordingly, we reverse the dismissal of this matter.

I.

We accept Plaintiffs' well-pleaded allegations as true throughout this summary of the facts. *See Wag More Dogs, Corp. v. Cozart*, 680 F.3d 359, 364–65 (4th Cir. 2012).

Defendants comprise many of the largest shipbuilders and naval-engineering consultancies in the country. Roughly 40% of naval engineers work for shipbuilders, and most shipbuilders perform contract work for the federal government to build the U.S. public fleet. The largest shipbuilders—Defendants General Dynamics and Huntington Ingalls—own the five major private U.S. shipyards that build warships. Another 40% of naval engineers work for naval-engineering consultancies, which also often work as contractors for the federal government.

4

Throughout the class period, 2000 to the present day, "industry insiders acknowledged that there was an industry-wide shortage of naval engineers." J.A. 86.[1] So one might expect to see "a high degree of labor mobility" in which Defendants "would have competed aggressively to lure away each other's employees by offering better salaries and benefits." J.A. 86. But in reality, "naval engineers generally spend their entire careers without being solicited by a rival firm," "Defendants maintained relatively uniform compensation structures," and salaries were "far below what would be available in a competitive market." J.A. 44, 86, 92.

Plaintiffs allege that this lack of mobility has been deliberately manufactured through a no-poach agreement among Defendant firms that "prohibits any Defendant from actively recruiting naval engineers from other Defendants," allowing them to suppress wages through a lack of competition. J.A. 74.

Plaintiffs D'Armiento and Scharpf worked as naval engineers for Defendants from 2002 to 2004 and 2007 to 2013 respectively. Plaintiffs learned of the no-poach agreement in April 2023 following an "investigation [that] uncovered direct evidence of the conspiracy, gathered from eyewitness industry participants." J.A. 75.

Six months later, Plaintiffs brought this putative antitrust class action against nineteen shipbuilders and naval-engineering consultancies and one recruitment agency. They allege that, although its "origins are obscure," the conspiracy began as early as 1980 and was ubiquitous by 2000, and that it continues to this day. J.A. 79. Plaintiffs further

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

5

allege that "[e]ach Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime." J.A. 74.

Plaintiffs interviewed multiple industry insiders, quoted anonymously in the Complaint, who acknowledged the existence of the no-poach agreement and provided some details about how it worked. The firms had a "gentlemen's agreement" that they would not actively "'recruit people' from competitors." J.A. 75–76; *accord* J.A. 76 ("I never recruited anyone actively from a competitor."); J.A. 77 (executive at Defendant Gibbs & Cox recounting "that he overheard a colleague say to another colleague in regard to recruiting a potential candidate, 'He works for [the firm now called Serco], we can't do that'"); J.A. 78 (manager involved in recruitment for Defendant Thor Solutions stating that "we would not poach from" companies with which Thor worked, including from Defendant Alion). A recruiter from Defendant Serco explained that his company maintained a "do not hire list" of allied companies from which he was not permitted to recruit. J.A. 75.

And while it was acceptable to offer a position to an engineer from a Defendant firm who applied on their *own* initiative, interviewees explained how the no-poach agreement was still enforced even in those situations. For example, an executive explained that if their company's employee applied to and was accepted by Defendant Gibbs & Cox, that company would "call me and say, 'We didn't poach him.'" J.A. 77. And a naval engineer said that, after he applied to work at other firms, "he was required to specify that he had independently pursued the opportunity and not been solicited." J.A. 75.

6

Plaintiffs allege that Defendants concealed this conspiracy by "carefully avoiding" the creation of any documentation of its existence and by referring to it obliquely. J.A. 96. Several of the interviewees described the conspiracy as a "gentlemen's agreement." J.A. 74, 78. They also described the agreement as "non-ink-to-paper," J.A. 46, 78, and one said that "[they] don't put that in writing. You'd be hard pressed to find that in writing," J.A. 46; *see* J.A. 76 (agreement was "never reduced to writing"). Instead, the agreement was "passed on only as verbal instructions from executives to managers." J.A. 76. One recruiter stated that companies asking for recruitment help "would often use coded language to discuss the set of competitors whose employees the hiring manager did not want to recruit, referring to those companies as 'friends' or explaining that the company 'had a relationship' with these competitors." J.A. 46. Plaintiffs allege the agreement was enforced "through private phone calls between high-level executives and unofficial retribution." J.A. 101.

The district court granted Defendants' Rule 12(b)(6) motion in April 2024, finding that Plaintiffs' claims were time-barred by the Sherman Act's four-year statute of limitations.[2] After a review of Fourth Circuit fraudulent-concealment case law, the court concluded that Plaintiffs could "not succeed on their claim that, by the creation of and participation in a secret conspiracy, the Defendants committed an act of concealment that

---

[2] That is, all Defendants moved to dismiss save Faststream Recruitment Ltd. Faststream did not appear in the district court prior to the motion to dismiss. Plaintiffs later "filed a notice of settlement with Faststream" and moved for approval of the settlement. *Scharpf v. Gen. Dynamics Corp.*, No. 1:23-cv-1372, 2024 WL 1704665, at *1 n.1 (E.D. Va. Apr. 19, 2024).

tolls the statute of limitations" because Defendants' alleged non-ink-to-paper agreement was "simply . . . [a] failure[] to admit wrongdoing." *Scharpf v. Gen. Dynamics Corp.*, No. 1:23-cv-1372, 2024 WL 1704665, at *8 (E.D. Va. Apr. 19, 2024). Plaintiffs timely appealed.

## II.

We review de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6). *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 545 (4th Cir. 2019). We must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citations omitted). Most pleadings must satisfy Rule 8's standard of a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). To survive a motion for dismiss, the complaint must "state[] a plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The normal pleading standards are heightened for allegations of fraudulent concealment as Federal Rule of Civil Procedure 9(b) states that parties must allege "fraud . . . with particularity." However, we apply a "relaxed Rule 9(b) standard" in "cases involving alleged fraud by omission or concealment"—such as allegations of a non-ink-to-paper agreement—because "it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023). And we have held that a court considering a fraudulent-concealment case "should hesitate to

8

dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Edmonson*, 922 F.3d at 553 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

So, a plaintiff must allege an affirmative act of concealment under a relaxed (but not eliminated) Rule 9(b) particularity standard.

### III.

### A.

The Sherman Act has a four-year statute of limitations. 15 U.S.C. § 15b. But if a defendant engages in fraudulent concealment, the limitations period does not begin to run until the plaintiff discovers the violation. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995). To toll a limitations period through fraudulent concealment, "a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.*

In this Circuit, a plaintiff satisfies the first element by "provid[ing] evidence of affirmative acts of concealment" by the defendants. *Id.* at 126. We hold that an agreement that is kept "non-ink-to-paper" to avoid detection can qualify as an affirmative act of concealment.

9

Our conclusion helps to preserve the careful balance between statutes of limitation and the doctrine of fraudulent concealment. Statutes of limitation are designed to "protect defendants from stale or fraudulent claims." *Id.* at 125 (citing *Wood v. Carpenter,* 101 U.S. 135, 139 (1879)). But, more than a century ago, the Supreme Court noted that it could not "believe that Congress intended to give immunity to those who for the period named in the statute might be able to conceal their fraudulent action from the knowledge of the [victim]." *Exploration Co. v. United States*, 247 U.S. 435, 449 (1918). The Supreme Court has therefore instructed "that the fraudulent concealment tolling doctrine is to be 'read into every federal statute of limitations,'" including that in the Sherman Act. *Marlinton*, 71 F.3d at 122 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). This tolling doctrine is designed "to prevent a defendant from 'concealing a fraud . . . until' the defendant 'could plead the statute of limitations to protect it.'" *Id.* (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874)). This balance would be "subverted . . . if defendants [were] permitted to use statutes of limitation to shield themselves from liability for unlawful conduct by keeping that conduct secret." *Id.* at 125.

The Supreme Court's adoption of the fraudulent-concealment tolling doctrine left open the question of how, exactly, to evaluate when a defendant has engaged in such fraudulent concealment. In a series of decisions in the 1980s and 1990s, the circuits coalesced around three standards: the separate-and-apart standard, the self-concealing standard, and the affirmative-acts standard. *Id.* at 122.

Under the separate-and-apart standard, the plaintiffs must show that the defendants engaged in fraudulent concealment separate and apart from the antitrust conspiracy. *Id.*

10

Under the self-concealing standard, "a plaintiff . . . merely [must] prov[e] that a self-concealing antitrust violation has occurred."[3] *Id.* Finally, under the intermediate affirmative-acts standard, a plaintiff "must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself." *Id.* Today, the circuits that have spoken on the issue have largely adopted the affirmative-acts standard.[4]

Our cornerstone case of *Marlinton* followed this majority approach and supports our conclusion that unwritten agreements can constitute fraudulent concealment. In *Marlinton*, large dairies allegedly conspired to fix milk prices. Supermarkets sued the dairies years later, pointing to testimony from a dairy official given under a grant of

---

[3] Judge Higginbotham provided a helpful hypothetical to explain the self-concealing standard in *Texas v. Allan Construction Co.*, 851 F.2d 1526 (5th Cir. 1988). "Sell[ing] a fake vase as if it were an antique" is a self-concealing violation because "[d]eception is an essential element of the wrong, and one that is not intended merely to cover up the wrong itself." *Id.* at 1529. By contrast, "steal[ing] a vase" and "replac[ing] it with a worthless replica is not self-concealing" because "[t]he wrong is the theft of the vase; the replacement is an act separate from the wrong itself and aimed only at concealing the fact that the real vase has been stolen." *Id.* at 1529–30.

[4] The First, Fifth, Sixth, and Ninth Circuits use the affirmative-acts standard. *See Berkson v. Del Monte Corp.*, 743 F.2d 53, 56 (1st Cir. 1984); *Allan Constr. Co.*, 851 F.2d at 1531–32; *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988); *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988). In the Second, Eleventh, and D.C. Circuits, a plaintiff can either show an affirmative act of concealment or that the defendant committed a self-concealing violation. *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083–85 (2d Cir. 1988); *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1124 (11th Cir. 2017); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1491–92 (D.C. Cir. 1989). In contrast, by an evenly divided en banc panel, the Tenth Circuit affirmed a district court that applied the separate-and-apart standard. *See Colorado ex rel. Woodard v. W. Paving Const. Co.*, 630 F. Supp. 206, 208, 210 (D. Colo. 1986), *aff'd by an equally divided court*, 841 F.2d 1025 (10th Cir. 1988) (en banc) (per curiam).

immunity in a prior criminal case. *Id.* at 121. That official testified to secret meetings with officials from other dairies to fix prices, explaining that these meetings were purposefully "conducted away from the office" and that he would fill out his expense reports "in such a manner" that nobody would learn of the meetings. *Id.* Applying the "separate-and-apart" standard of fraudulent concealment, the district court granted the defendants summary judgment. *Id.*

We disagreed. We first rejected the separate-and-apart standard as too stringent and indeterminate. *Id.* at 124–26. We also found the self-concealing standard inapplicable because concealment is not a necessary element of a price-fixing violation, although we didn't rule it out for future cases. *Id.* at 123.

We instead adopted the intermediate affirmative-acts standard. *Id.* at 126. As the paradigmatic example of that standard, we repeatedly cited a Fifth Circuit case which held that "'secret agreements and covert price-setting sessions' . . . . could count as proof of fraudulent concealment." *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531–32 (5th Cir. 1988) (quoting *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir. 1983)); *see Marlinton*, 71 F.3d at 125. And we rejected the argument that fraudulent concealment must include an act of commission rather than omission, making clear that conspirators who "are *careful not to write down* evidence of their antitrust violations in the first place" can be held accountable. *Marlinton*, 71 F.3d at 125 (emphasis added). So, although we remanded the case to the district court to apply the affirmative-acts standard

12

to the facts in the first instance, *Marlinton*'s reasoning makes clear that this standard can include secret, non-ink-to-paper agreements.[5]

Indeed, district courts in our Circuit have relied on *Marlinton* to deny motions to dismiss on facts similar to those here. In *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-2521, 2020 WL 5544183, at *13 (D. Md. Sept. 16, 2020), the plaintiffs alleged that the defendants held "off the books" "secret meetings" where they manipulated wage data. The district court found that "[a]ll of these alleged techniques plausibly constitute affirmative acts of concealment." *Id.* And in *Pro Slab, Inc. v. Argos USA LLC*, No. 2:17-cv-3185, 2019 WL 4544086, at *14 (D.S.C. Sept. 19, 2019), the plaintiffs alleged that the defendants created "anticompetitive agreements during secret meetings" and "misrepresented market conditions" in price-increase letters to customers. *Id.* The district court found that these allegations amounted to more than a mere "failure to admit to wrongdoing." *Id.* (quoting *Boland v. Consol. Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 518 (D.S.C. 2011)).

Nevertheless, Defendants flatly claim that "a secret agreement . . . is not an affirmative act of concealment." Response Br. at 35. This is both inconsistent with *Marlinton*'s reasoning and a bad rule on its own merits. Defendants' blanket rule would "encourage[] [wrongdoers] to take advantage of the limitations period to commit secret illegal conduct without penalty." *Edmonson*, 922 F.3d at 549 (quoting *Marlinton*, 71 F.3d

---

[5] On remand, the district court denied a motion to dismiss in which the defendants argued that the case was time-barred, but later granted summary judgment for lack of antitrust standing. *Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3, 1998 WL 610648, at *1 n.5, *2 (4th Cir. 1998) (per curiam) (unpublished table decision).

13

at 125). It would also lead to illogical results, as there is "no valid reason to differentiate between those conspiracies in which the conspirators document their antitrust violations and subsequently shred those documents, from those in which the conspirators are careful not to write down evidence of their antitrust violations in the first place." *Marlinton*, 71 F.3d at 125. Surely, Congress did not intend for us to reward conspirators who are savvy enough to avoid taking notes while punishing those who take notes but later destroy them. This would unjustly "benefit those defendants who were cunning enough to commit their crimes initially in such a manner that there was no need for further concealment." *Id.*

Our remaining case law is not to the contrary. Defendants claim that *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987), a case that predates *Marlinton*, held that even "lying about a secret conspiracy does not suffice" for fraudulent concealment. Response Br. at 33. But *Pocahontas*'s holding is ambiguous, as we later recognized in *Marlinton*, and is too thin a reed on which to rest such a counterintuitive contention.

The plaintiff in *Pocahontas*, a coal-mining company, asked a defendant company "why [that defendant] refused to accept certain deliveries of coal and why the price paid for delivered coal was so low." *Pocahontas*, 828 F.2d at 218. The defendant "responded that the delivery quotas were due to a railroad strike . . . and that the pricing simply was the maximum allowable." *Id.* More than four years later, the plaintiff sued that company and several others involved in coal mining and production, alleging that they had created "interlocking directorates" to shoulder the plaintiff out of the market. *Id.* at 215.

14

We held that the plaintiff's fraudulent-concealment allegations were insufficient. We concluded that "an alleged failure to own up to illegal conduct upon this sort of timid inquiry" did not constitute fraudulent concealment, as "[i]t can hardly be imagined that illegal activities would ever be so gratuitously revealed. 'Fraudulent concealment' implies conduct more affirmatively directed at deflecting litigation . . . and 'due diligence' contemplates more than the unpursued inquiry allegedly made by [the plaintiff]." *Id.* at 218–19.

But as *Marlinton* later noted, it is unclear "to what extent [*Pocahontas*] was based on the fact that the plaintiff had constructive notice of the antitrust violations or had failed to provide evidence of due diligence." *Marlinton*, 71 F.3d at 122. It also seems *Pocahontas* concluded that the plaintiff's question was so "timid"—i.e., so vague and indirect in probing the allegedly illegal acts—that the defendant's answer was not fraudulent at all and therefore was not "affirmatively directed at deflecting litigation." *Pocahontas*, 828 F.2d at 218–19; *see GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007) (quoting this portion of *Pocahontas* for the proposition that "wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it").

Given these ambiguities, *Marlinton* determined that *Pocahontas* "did not expressly adopt any [fraudulent concealment] standard[]" at all, and instead "simply examined the allegations of the complaint and concluded that the plaintiff had failed to allege facts sufficient to invoke the fraudulent concealment doctrine." *Marlinton*, 71 F.3d at 122. *Pocahontas* therefore should not be read to establish a general standard for fraudulent concealment—much less a blanket rule that secret, unwritten conspiracies are legally

15

insufficient to toll a statute of limitations. *See also Detrick v. Panalpina, Inc.*, 108 F.3d 529, 542 (4th Cir. 1997) ("As the *Marlinton* court noted, the *Pocahontas* court did not employ any of the standards outlined in *Marlinton*, which of course, is not surprising given that neither party argued for the adoption of any standard, and the case law had not been developed on that issue in the Fourth Circuit.").

Defendants also repeatedly cite *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012), which affirmed *Boland*, 868 F. Supp. 2d 506, but that case is of no more help to them than *Pocahontas*. There, the plaintiffs alleged that they were injured by enforcement of the defendant real estate brokerages' "by-laws, policies, and procedures." 2d Am. Compl. ¶ 1, *Boland*, 868 F. Supp. 2d 506, ECF No. 22, 2010 WL 1787986. The plaintiffs also alleged that the defendants fraudulently concealed their conspiracy, as the defendants "never told [them] that they were fixing the prices of real-estate services . . . . [and] the [d]efendants . . . [met] secretly [and gave] pretextual reasons for costs of real-estate services." *Id.* ¶ 64. The district court dismissed the case, concluding that

> the [p]laintiffs' allegations lack the particularity required by Rule 9 and, therefore, are legally insufficient to state a claim of fraudulent concealment. The cases are clear that a plaintiff must allege affirmative acts of concealment or affirmative steps to mislead; here, the Court believes that the [p]laintiffs' allegations amount to no more than a failure to admit to wrongdoing, which does not suffice.

*Boland*, 868 F. Supp. 2d at 518. This sparse reasoning leaves us uncertain whether the district court dismissed the complaint because:

- the plaintiffs' allegations were non-particularized,

- mere failure to inform is legally insufficient,

16

- the plaintiffs' argument—that the defendants fraudulently concealed their "secret[]" agreement in "by-laws"—was fundamentally implausible, or

- secret meetings are insufficient as a matter of law (as Defendants now maintain).

We affirmed in a footnote with one sentence of reasoning: "The district court properly concluded that [the] plaintiffs failed to 'allege affirmative acts of concealment or affirmative steps to mislead' and that [the] 'plaintiffs' allegations amount to no more than a failure to admit to wrongdoing, which does not suffice.'" *Robertson*, 679 F.3d at 291 n.2 (quoting *Boland*, 868 F. Supp. 2d at 518) (citing *Pocahontas*, 828 F.2d at 218–19). Given the uncertainty surrounding the district court's reasoning, it is unclear exactly what *Robertson* determined that the district court had "properly concluded." So we don't agree that *Robertson* sets out a general rule that secret meetings are insufficient to constitute fraudulent concealment as a matter of law—particularly because such a rule would conflict with *Marlinton*'s reasoning, which preceded *Robertson* and which *Robertson* did not cite.

In sum, the doctrine of fraudulent concealment is designed to prevent conspirators who take steps to avoid detection from hiding behind the statute of limitations. *See Edmonson*, 922 F.3d at 547 ("We do not believe that Congress intended to allow individuals and entities that conceal their [conspiracies] to reap the benefit of the statute of limitations as a defense."). Neither logic nor our case law support Defendants' proposition that conspirators who cunningly avoid creating evidence of their conspiracy escape this general rule. On the contrary, we reaffirm *Marlinton*'s reasoning, which makes clear that such a conspirator commits an affirmative act of fraudulent concealment.

17

B.

As no named Plaintiff has worked for Defendants since 2013, Plaintiffs must adequately plead affirmative acts of fraudulent concealment to avoid their claims being time-barred. We conclude that, under a relaxed Rule 9(b) standard, Plaintiffs have pleaded affirmative acts of fraudulent concealment with particularity.

Plaintiffs adequately allege that Defendants engaged in affirmative acts by creating an illicit no-poach agreement that they deliberately kept non-ink-to-paper. The complaint quotes multiple industry insiders who acknowledge the existence of the no-poach agreement. For example, one witness "confirmed the existence of a 'gentlemen's agreement' among these firms that 'you didn't recruit people' from competitors." J.A. 75–76. Plaintiffs claim that "at least one witness" verified each engineering Defendant's "adherence to the industry's no-poach regime." J.A. 74.

Plaintiffs further allege that Defendants have "carefully avoid[ed] putting anything in writing" to "conceal[] their unlawful conduct," J.A. 96, and that the agreement was "never reduced to writing and passed on only as verbal instructions from executives to managers," J.A. 76. Plaintiffs' interviewees support the proposition that Defendants carefully avoided putting their alleged no-poach agreement in writing. An in-house recruiter for a Defendant "confirmed the existence of a 'non-ink-to-paper' agreement between Defendants that 'we would not poach from each other.'" J.A. 46. "Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide 'gentlemen's agreement[.]'" J.A. 74. And one "industry insider" stated that Defendants

18

"don't put [their agreement] in writing. You'd be hard pressed to find that in writing." J.A. 46.

These allegations meet Rule 9(b)'s particularity requirement, which is relaxed but not eliminated in "cases involving alleged fraud by omission or concealment" like this one. *Corder*, 57 F.4th at 402. Defendants have been "made aware" that they will have to defend against allegations of an unwritten agreement not to poach each other's employees unless those employees affirmatively seek employment. *Edmonson*, 922 F.3d at 553. The agreement allegedly "began at least by the early 1980s [and] expanded to industry-wide proportions by at least 2000." J.A. 74. Defendants allegedly avoided detection by transmitting the agreement orally from executives to managers and by referring to it obliquely. Defendants took these steps "to evade detection or accountability." J.A. 96. Furthermore, although Plaintiffs are a bit coy about how many interviews they conducted, their interviewees—who consistently and independently describe a gentlemen's or non-ink-to-paper no-poach agreement—show that Plaintiffs have obtained "substantial prediscovery evidence" of Defendants' alleged affirmative acts of concealment. *Edmonson*, 922 F.3d at 553. Rather than pleading based on information and belief, the bulk of Plaintiffs' allegations are quotes from interviews with industry insiders. These interviews strengthen the plausibility of Plaintiffs' allegations.

Our colleague in dissent argues that we effectively apply the self-concealing standard by allowing Plaintiffs' claims to proceed. We respectfully disagree. A self-concealing violation occurs only when "deception or concealment is a *necessary element* of the antitrust violation." *Marlinton*, 71 F.3d at 123 (emphasis added). For example,

19

"price-fixing is not inevitably deceptive or concealing" because "the deceptive aspect of price-fixing is intended solely to cover up the illegal act[;] price fixing is not *by its very nature* concealed." *Id.* (quotation omitted). Here, the alleged illegal act is a no-poach conspiracy, which—just like a price-fixing conspiracy—is not inherently deceptive or concealed. Although it would be unwise, Defendants could openly refuse to hire each other's employees.

Instead, Defendants allegedly *covered up* their no-poach conspiracy by, among other things, "carefully avoiding putting anything in writing" and using coded language to refer to it. J.A. 96. That meets the affirmative-acts standard, which allows "the plaintiff's proof [to] include acts of concealment involved in the antitrust violation itself." *Marlinton*, 71 F.3d at 122.

## C.

Even if a plaintiff adequately alleges affirmative acts, such as a non-ink-to-paper agreement, the plaintiff must still allege facts sufficient to infer that the defendants performed the acts *with the intent to* prevent or deceive others from discovering their scheme. Otherwise the plaintiff will have failed to show that the defendant "*fraudulently* concealed facts that are the basis of the plaintiff's claim," *Marlinton*, 71 F.3d at 122 (emphasis added), and that the defendant did more than engage in "mere silence," *Wood*, 101 U.S. at 143.

Courts usually must infer intent from circumstantial evidence. That is why Rule 9(b) states that "intent . . . may be alleged generally," and why we do not apply a heightened pleading standard to the intent elements of fraudulent allegations. *See United States ex rel.*

20

*Taylor v. Boyko*, 39 F.4th 177, 197 n.14 (4th Cir. 2022) (noting that district court should apply normal Rule 8 standard to an allegation of fraudulent intent rather than a heightened standard under Rule 9(b)). So we will address how courts might infer fraudulent intent from an allegation of an affirmative act, although we emphasize that this is not an exhaustive list.

Courts should first consider whether the affirmative acts themselves imply fraudulent intent. For example, when the defendants in *Edmonson* "back[]dated" documents that would have revealed their conspiracy, it was hard to imagine a benign purpose for their acts. 922 F.3d at 553. In contrast, when the plaintiff in *Pocahontas* asked a "timid" question only indirectly related to the alleged conspiracy, it was difficult to infer that the defendant's response was intended to "deflect[] litigation." 828 F.2d at 218–19. For allegations of unwritten agreements, it will sometimes be difficult to infer fraudulent intent: perhaps the agreement was so vague that there was no reason to commit it to paper, or maybe it was just simpler for the defendants to communicate orally. *Cf. Robertson*, 679 F.3d at 291 n.2 (noting that a mere "failure to admit to wrongdoing" does not itself suffice). On the other hand, if an unwritten agreement allegedly had well-defined rules, was in effect for an extended period, or had many participants, it would be easier to infer fraudulent intent.

Courts should also consider whether the underlying violation—the violation that the affirmative acts are intended to cover up—is obviously illegal. When the alleged violation presents "extremely difficult and particularly close questions of law," it is more difficult to infer that an affirmative act was intended to avoid detection, as defendants may have not

21

even realized that their actions were illegal. *Boland*, 868 F. Supp. 2d at 516 (rejecting allegations of affirmative acts of concealment where underlying allegation was that a real estate information-sharing organization's rules were designed to exclude innovative brokerages); *see GO Computer*, 508 F.3d at 179 ("[W]rongdoing is not a straightforward matter of fact, and it is not fraud to deny it."). But where a plaintiff alleges an obvious legal violation, a court should more readily infer that an affirmative act was intended to avoid detection. *See Pro Slab*, 2019 WL 4544086, at *14–15 (denying dismissal of affirmative-acts allegation that defendants conspired in secret meetings and sent misleading letters to customers where plaintiff alleged underlying violation of price-fixing and bid-rigging).

## D.

Applying Rule 8's more lenient standard, we can infer from Plaintiffs' allegations that Defendants' affirmative acts were intended to avoid detection.

At the most basic level, it is hard to imagine that a decades-old multilateral agreement—with a clear and apparently anticompetitive rule (you shall not hire your co-conspirators' employees) and a clear exception (unless the employee first applies to you)—would remain unwritten merely for the sake of convenience. The coded language Defendants allegedly used to refer to their conspiracy could also indicate that they were self-conscious of its illegality. Plaintiffs allege that one recruiter claimed that Defendants asking for recruitment help "would often use coded language to discuss the set of competitors whose employees the hiring manager did not want to recruit, referring to those companies as 'friends' or explaining that the company 'had a relationship' with these competitors." J.A. 46. And the ubiquitous references to a "gentlemen's agreement" could

22

indicate that Defendants wanted to make their agreement seem like an agreement among friends as opposed to an illegal conspiracy, or that Defendants recognized they could not rely on the legal enforceability of a written agreement. In a case involving similar allegations in another industry, a California district court applying the affirmative-acts standard concluded as much when it found that allegations that the defendants' conspiracy "was termed a 'gentlemen's agreement'" and that the defendants "intentionally cho[se] to meet in-person or over the telephone, rather than risk memorializing details about the alleged conspiracy" in writing helped to "raise the reasonable inference that [the d]efendants took affirmative steps to conceal the details of their conspiracy." *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1201 (N.D. Cal. 2015).

The allegedly obvious illegality of Defendants' no-poach agreement also weighs in favor of finding that their affirmative acts were intended to conceal or deceive.[6] *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (vacating dismissal of an allegation of a no-poach agreement and warning that a naked no-poach agreement is a per se Sherman Act violation), *cert. denied*, 144 S. Ct. 1057 (2024); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1214 (finding that allegations of an "information sharing and no-poach scheme . . . to suppress wages" raised a plausible inference of a per se antitrust violation). An unwritten gentlemen's agreement to commit

---

[6] We need not determine today whether this alleged no-poach agreement is actually illegal. That issue has not been briefed and we leave it to the district court to decide in the first instance. Our point is that Defendants probably would have *thought* a no-poach agreement was illegal, which makes it more likely that their determination not to put the agreement in writing was intended to avoid detection.

23

an obvious antitrust violation appears much more suspect than an unwritten gentlemen's agreement to do something that presents "extremely difficult and particularly close questions of law."[7] *Boland*, 868 F. Supp. 2d at 516.

IV.

Even though Plaintiffs alleged an affirmative act of concealment with particularity and with the requisite intent, their claim must be dismissed if they failed to exercise due diligence in uncovering the alleged conspiracy.[8] *Pocahontas*, 828 F.2d at 218. We conclude that, at the motion-to-dismiss stage, Plaintiffs have sufficiently alleged due diligence.

"Generally, whether a plaintiff exercised due diligence is a jury issue not amenable to resolution on the pleadings[.]" *Edmonson*, 922 F.3d at 554. And we have "long . . . held that it is possible for a plaintiff to satisfy the due diligence requirement without demonstrating that it engaged in any specific inquiry" because "if the plaintiff was not on inquiry notice, then there is nothing to provoke inquiry." *Edmonson*, 922 F.3d at 554 (cleaned up) (quoting *Marlinton*, 71 F.3d at 128). A plaintiff is on inquiry notice "if the plaintiff (1) believes he might have been harmed and (2) knows who is responsible for that harm." *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 113 (4th Cir. 2018).

---

[7] Because we hold that the non-ink-to-paper agreement suffices as an affirmative act here, we do not reach Plaintiffs' other allegations of fraudulent concealment, nor Plaintiffs' argument that the district court erred by not granting them leave to amend their complaint to include additional allegations.

[8] Defendants do not contest the second element of the fraudulent concealment analysis: that Plaintiffs failed to discover the "facts that are the basis of the plaintiff's claim . . . within the statutory period." *Edmonson*, 922 F.3d at 548.

Here, as Plaintiffs do not allege that they did much of anything during the statutory period, their claim turns on whether they were on inquiry notice. The pleadings indicate that Plaintiffs did not believe they had been harmed until they learned of the no-poach conspiracy through interviews with industry insiders in April 2023. *See Pocahontas*, 828 F.2d at 219 (requiring plaintiff to describe how they learned of the fraudulent concealment). Plaintiffs never allege that they were aware of the no-poach conspiracy before that investigation—on the contrary, they state that they "did not and could not have uncovered Defendants' conspiracy with the exercise of reasonable diligence. The Plaintiffs at all times believed that they were being compensated at competitive levels and were unaware of the agreement to pay sub-competitive wages." J.A. 102.

Defendants nonetheless argue that "Plaintiffs have pled their way into inquiry notice" for two principal reasons. Response Br. at 49. First, Defendants argue that the alleged conspiracy was "widely distributed" because it was "known by *multiple* HR and recruiting employees, managers, and executives at a multitude of companies over two decades." *Id.* at 51. So, the theory goes, Plaintiffs must have caught a whiff of it. It's certainly possible that word of the no-poach agreement trickled down to injured employees, including Plaintiffs. Or maybe Defendants managed to keep the agreement need-to-know. That is an issue of fact "not amenable to resolution on the pleadings." *Edmonson*, 922 F.3d at 558. *Compare id.* at 555 (reversing dismissal even though private litigation had commenced on related issues against some of the defendants during statutory period), *with GO Computer*, 508 F.3d at 178 (affirming summary judgment when plaintiff undisputedly met with FTC investigators during the statutory period about defendant's alleged antitrust

violations and an investigator told him "[t]his looks like a textbook case of abuse of monopoly power").

Second, Defendants argue that Plaintiffs were on inquiry notice because they allege "naval engineers generally spend their entire careers without being solicited by a rival firm." Response Br. at 49–50 (quoting J.A. 44). Defendants contend that this was suspicious enough to put Plaintiffs on notice of the conspiracy. Plaintiffs' complaint, on the other hand, goes on to state that "this would not have been enough for a reasonable plaintiff to suspect and uncover" the no-poach agreement. J.A. 102. Again, this is a question of fact. Based on the complaint alone, we cannot say that the named Plaintiffs should have known about the conspiracy because they were never recruited by another company. They may have thought that fact reflected deficiencies in their own employability, or the vagaries of chance, rather than an indication of a widespread conspiracy.[9]

---

[9] As Defendants note, Plaintiffs allege that one applicant for jobs at "other naval engineering firms" was "required to specify that he had independently pursued the opportunity and not been solicited," although that applicant was still "unaware of the no-poach agreement." J.A. 75; *see* Response Br. at 50–51. Regardless of whether this requirement put that applicant on inquiry notice, there is no allegation that Plaintiffs were ever asked a similar question.

26

V.

We conclude that Plaintiffs have adequately alleged fraudulent concealment. Accordingly, we reverse the judgment of the district court and remand this case for further proceedings.

*REVERSED AND REMANDED*

DIAZ, Chief Judge, dissenting:

To invoke the fraudulent concealment tolling doctrine, a plaintiff in an antitrust action "must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995). When "determining whether antitrust plaintiffs have satisfied the first element of this test," courts have developed three standards: "the 'self-concealing' standard, the 'separate and apart' standard, and the intermediate, 'affirmative acts' standard." *Id.*

The majority correctly explains that "the circuits that have spoken on the issue," including our own, "have largely adopted the affirmative-acts standard." Majority Op. at 11. Under this standard, "a plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations." *Marlinton*, 71 F.3d at 122.

My colleagues purport to hew to this standard. But because they effectively apply the self-concealing standard, collapsing the analysis down to the sole question of whether a conspiracy existed, I respectfully dissent.

I.

Susan Scharpf and Anthony D'Armiento worked in the naval shipbuilding industry from 2007 to 2013 and 2002 to 2004, respectively. In 2023, they sued seventeen defendants on behalf of themselves and a putative class consisting of "all persons employed as naval

28

architects and/or marine engineers."[1]  J.A. 41.  Scharpf and D'Armiento allege that the defendants—including "shipbuilders that produce military vessels large and small, specialized consulting firms, and a recruiting firm that sometimes serves these companies," J.A. 41 ¶ 3—enforced an "unwritten 'gentlemen's agreement'" "not to actively recruit, or 'poach,' each other's employees," J.A. 41 ¶ 1.[2]

Though the origins of this "gentlemen's agreement" are "obscure," the plaintiffs allege that "by at least 2000[,] all major players in the industry had reached a mutual understanding that they would not poach each other's employees."  J.A. 79 ¶ 160.  This "unwritten, broad secret agreement," J.A. 96 ¶ 206, survived "an astonishing number of sales, spin-offs, reorganizations, and other corporate events," J.A. 79 ¶ 160.

The majority neatly outlines the recruiters, industry insiders, hiring managers, and others who attested to the existence of this "gentlemen's agreement," or otherwise acknowledged the defendants' "non-ink-to-paper" no-poach agreement.  *See, e.g.*, Majority Op. at 6–7, 18–19.  But the majority doesn't rely on these allegations just to find that the plaintiffs have adequately alleged the existence of a conspiracy between the defendants. Rather, it relies on them to conclude that the plaintiffs have "adequately allege[d] that [the]

---

[1] "Naval architects design vessel hulls and are responsible for a vessel's overall stability and performance, while marine engineers design onboard systems such as propulsion mechanics, electrical systems, water purification, heating systems, and air conditioning." *Scharpf v. Gen. Dynamics Corp.*, No. 1:23-cv-01372, 2024 WL 1704665, at *2 (E.D. Va. Apr. 19, 2024) (internal quotations omitted).

[2] The plaintiffs allege that the defendants' no-poach agreement didn't apply to those employees who applied to a competitor "on their *own* initiative."  Majority Op. at 6.

[d]efendants engaged in affirmative acts [of concealing the conspiracy]," *id.* at 18, sufficient to toll (indefinitely, it seems) the statute of limitations on the plaintiffs' otherwise time-barred antitrust claims.

Respectfully, this is error. The fraudulent concealment doctrine explains why.

## II.

"The purpose of [the] fraudulent concealment doctrine is to 'ensure that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (quoting *Marlinton*, 71 F.3d at 125). Thus, the doctrine "applies in situations where the defendant has wrongly deceived or misled the plaintiff in order to conceal the existence of a cause of action." *Id.* (cleaned up).

Recall that a plaintiff seeking to invoke the fraudulent concealment doctrine must show that "(1) the party pleading the statute of limitations fraudulently concealed the facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Marlinton*, 71 F.3d at 122 (cleaned up). Fraudulent concealment requires "a plaintiff [to] prove that the defendants affirmatively acted to conceal their antitrust violations," though "the plaintiff's proof may include acts of concealment involved in the antitrust violation itself." *Id.*

We've declined to adopt the so-called "self-concealing" standard, which turns simply on whether the plaintiffs proved "that a self-concealing antitrust violation has

30

occurred."[3]  *Id.*  My colleagues explain the difference between the standards with a vase

analogy first described by the Fifth Circuit.  *See* Majority Op. at 11 n.3 (citing *Texas v.*

*Allan Constr. Co.*, 851 F.2d 1526 (5th Cir. 1988)).    But the majority's "helpful

hypothetical" also illustrates its mistake in this case.  *Id.*

Under the hypothetical, "[s]elling a fake vase as if it were an antique' is a self-

concealing violation because 'deception is an essential element of the wrong, and one that

is not intended merely to cover up the wrong itself.'"  *Id.* (cleaned up).  "By contrast,

'stealing a vase' and 'replacing it with a worthless replica is not self-concealing' because

'the wrong is the theft of the vase; the replacement is an act separate from the wrong itself

and aimed only at concealing the fact that the real vase has been stolen." *Id.* (cleaned up).[4]

The problem for the majority (and for the plaintiffs) is that the complaint alleges

that the defendants did no more than sell a fake vase.

The plaintiffs allege that the defendants engaged in a sprawling, multi-decade

"unwritten 'gentlemen's agreement'" not to poach one another's employees.  J.A. 41 ¶ 1.

This "non-ink-to-paper," J.A. 46 ¶ 12, "unwritten, broad secret agreement," J.A. 96 ¶ 206,

captured an "industry wide" unspoken rule not to recruit from rivals, J.A. 96 ¶ 205.  *See*

*also* J.A. 46 ¶ 12 (alleging that "[the defendants] don't put that in writing.  You'd be hard

---

[3] "[I]n the Second, Eleventh, and D.C. Circuits, a plaintiff can either show an affirmative act of concealment or that the defendant committed a self-concealing violation."  Majority Op. at 11 n.4.

[4] We have similarly clarified that "[t]he self-concealing standard is only proper when deception or concealment is a necessary element of the antitrust violation." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541 n.24 (4th Cir. 1997).

pressed to find that in writing."); J.A. 76 ¶ 149 (alleging that agreement was "never reduced to writing").

In other words, "an essential element" of the alleged conspiracy is that it was unwritten. *Allan Constr.*, 851 F.2d at 1529. Deceit was always the beating heart of this "non-ink-to-paper" agreement. *See* Majority Op. at 23 (recognizing the "obvious illegality of [the defendants'] no-poach agreement").

Look no further than what the majority relies on to revive the plaintiffs' claims. The majority recounts the multitude of witnesses who verified "the existence of a 'non-ink-to-paper' agreement" between the defendants that they "would not poach from each other." *Id.* at 18 (cleaned up); *see also id.* at 7 ("Several of the interviewees described the conspiracy as a 'gentlemen's agreement.'" (cleaned up)); *id.* at 18 ("Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide 'gentlemen's agreement.'" (cleaned up)).

The majority also credits the plaintiffs' "claim that 'at least one witness' verified each [defendant's] 'adherence to the industry's no-poach regime.'" *Id.* at 18 (cleaned up). And in pleading fraudulent concealment, the plaintiffs emphasize that their claims were "not time-barred because [the defendants] affirmatively concealed the existence, true nature, and scope of their industry-wide 'gentlemen's agreement.'" J.A. 95 ¶ 204.

While we're bound to take those allegations as true at this stage, they all go to the defendant's alleged *conspiracy*, which, again, is an "*unwritten 'gentlemen's agreement'*" not to recruit from one another. J.A. 41 ¶ 1 (emphasis added). It follows then that broad evidence that the conspiracy was oral or secret or unwritten or understood among the

32

defendants shows no more than the "inherently deceptive" nature of the conspiracy.[5]

*Marlinton*, 71 F.3d at 123 n.1.  Simply put, the vase was always fake.

To be sure, the affirmative acts standard allows "the plaintiff's proof [to] include acts of concealment involved in the antitrust violation itself." *Marlinton*, 71 F.3d at 122. But here, the acts of concealment and the antitrust violation itself, at least as alleged by the plaintiffs and described by the majority, exist in concentric circles of evidence supporting the defendants' "decision to participate in a secret conspiracy." *Scharpf v. Gen. Dynamics Corp.*, No. 1:23-cv-10372, 2024 WL 1704665, at *8 (E.D. Va. Apr. 19, 2024).

And while it's also true that a general anticompetitive or wage-fixing scheme is "not inevitably deceptive or concealing," as we've found necessary for the "application of the self-concealing standard," *Marlinton*, 71 F.3d at 123, the plaintiffs have chosen to allege a scheme that *is* self-concealing.  By casting the defendants' antitrust scheme repeatedly and forcefully as an "unwritten, 'gentlemen's agreement,'" the plaintiffs effectively admit that its "deceptive aspect" was *part of* the conspiracy, and not "intended solely to 'cover up'

---

[5] The majority cursorily references the plaintiffs' allegations (stemming from the testimony of a single third-party recruiter) that unidentified "hiring managers" used broadly by the "[D]efendants[]" "often use[d] coded language to discuss the set of competitors whose employees the hiring manager did not want to recruit."  J.A. 46 ¶ 12; *see also* Majority Op. at 7.  The majority also mentions the plaintiffs' allegation that "the agreement was enforced 'through private phone calls between high-level executives and official retribution.'"  Majority Op. at 7 (quoting J.A. 101 ¶ 220).  While these allegations are more like "affirmative acts" of concealment by the defendants, they are inadequate under the particularity requirements of Rule 9(b).  *Infra* p.36.  The plaintiffs provide no information about when, or among whom, this "coded language" was used or these "private phone calls" were made, or how either related to the alleged conspiracy.

the illegal act," *Marlinton*, 71 F.3d at 123 (quoting *Allan Constr.*, 851 F.2d at 1530).  *See also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) ("Begin from the beginning: The plaintiff is the master of the complaint[] and therefore controls much about her suit." (cleaned up)).

In short, the district court was right to reject the plaintiffs' argument that the defendants' "unwritten rule" was an affirmative act of concealment.[6]  *Id.*

## III.

Beyond misapplying the affirmative acts standard, the majority ignores contrary precedent based on perceived "ambiguities," Majority Op. at 15, or "uncertainty," *id.* at 17, in the cases' holdings.  For example, my friends reject application of our seminal holding on fraudulent concealment in *Pocahantas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987).  There, we explained that a defendant's "failure to own up to illegal conduct" was insufficient to toll the statute of limitations.  *Id.* at 218–19.  But to the majority, because *Pocahantas* didn't "expressly adopt" one of the three fraudulent

---

[6] The plaintiffs trot out other allegations that they say show fraudulent concealment, including the defendants' "general public and non-public representations" about their "competitive" compensation and active recruitment; their "general statements that they comply with antitrust laws and are essentially law-abiding and ethical"; and their non-solicitation clauses in permissible teaming agreements that were allegedly "'cover' for the unlawful no-poach scheme."  *Scharpf*, 2024 WL 1704665, at *7.  The majority doesn't address these alternative claims, but, like the district court, I would find them unpersuasive.

34

concealment standards, Majority Op. at 15, its holding on the insufficiency of the failure-to-admit-wrongdoing allegations is somehow "ambiguous," *id.* at 14.

Likewise, the majority brushes off our decision in *Robertson v. Sea Pines Real Estate Cos.*, where we affirmed a district court's conclusion that "plaintiffs failed to 'allege affirmative acts of concealment or affirmative steps to mislead' and that [the] 'plaintiffs' allegations amount[ed] to no more than a failure to admit wrongdoing, which does not suffice.'" 679 F.3d 278, 291 n.2 (4th Cir. 2012) (quoting *Pocahantas*, 828 F.2d at 218–19).[7]  The alleged affirmative acts that the district court rejected included "meeting secretly, giving pretextual reasons for the costs of real estate services, and agreeing at meetings not [t]o discuss their illegal scheme publicly." *Boland v. Consol. Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 517–18 (D.S.C. 2011).

But because we summarily affirmed the district court's decision in a footnote, the majority claims "uncertainty" as to what we "properly concluded," and so rejects the case without further discussion.  Majority Op. at 17.  Tellingly though, as the district court here explained, *Robertson* "specifically affirmed the [*Boland*] court's conclusion," which it quoted from *Pocahantas*, that the plaintiffs' allegations "amount[ed] to no more than a failure to admit wrongdoing, which does not suffice [for fraudulent concealment]." *Scharpf*, 2024 WL 1704665, at *6 (quoting *Robertson*, 679 F.3d at 291 n.2).  All three

---

[7] *Robertson* consolidated interlocutory appeals from two related class action complaints.

35

cases (*Pocahantas* and *Boland/Robertson*) deserve more respect than the majority gives them.

My colleagues also substantially relax the required showing under Rule 9(b) that the plaintiffs must satisfy to plead any affirmative acts of fraudulent concealment. They do so by allowing the plaintiffs to repackage overlapping and general descriptions of a single conspiracy, rather than requiring them to allege discrete and particularized acts by the defendants to conceal the conspiracy. Majority Op. at 18–19.

The majority repeats that unnamed "industry insiders" "acknowledge[d] the existence of the no-poach agreement," although those insiders made no mention of when— or among whom—that agreement was made. *Id.* at 18. And they cite the—again, largely unidentified—"interviewees" who "support the proposition that [the defendants] carefully avoided putting their alleged no-poach agreement in writing," *id.*, along with the "[m]anagers with hiring authority" who "confirmed the existence of an industry-wide 'gentlemen's agreement,'" *id.* at 18. Around and around we go.

Worse yet, my friends excuse the plaintiffs from having to show any diligence whatsoever in pursuing claims in an alleged decades-long conspiracy, *id.* at 24–26, despite the plaintiffs' own allegations that collusion within the industry may have caused a "shortage of naval engineers," a lack of "labor mobility," and "relatively uniform compensation structures" that were "far below what would be available in a competitive market," *id.* at 5 (citing complaint).

The majority doesn't simply accept the plaintiffs' allegations as true; it does the plaintiffs' work for them. I agree that the law does, and should, prevent "conspirators who

36

cunningly avoid creating evidence of their conspiracy" from escaping liability for their illegal conduct. *Id.* at 17. But plaintiffs alleging a conspiracy don't get a free pass on time-barred claims. In our circuit—at least for now—they must show that the defendants affirmatively acted to conceal the conspiracy. Otherwise, we needn't bother having a statute of limitations defense at all.

Plaintiffs failed to make the requisite showing for fraudulent concealment. And the majority compounds that omission by applying the wrong standard in evaluating the fraudulent concealment claims. The district court correctly dismissed the complaint.

Because the majority holds otherwise, I respectfully dissent.